Matthew A. Barlow (9596)
mbarlow@wnlaw.com
Brittany Frandsen (16051)
bfrandsen@wnlaw.com
WORKMAN NYDEGGER
60 East South Temple, Suite 1000
Salt Lake City, Utah 84111
Telephone: (801) 533-9800
Facsimile: (801) 328-1707

*Attorneys for Kule, LLC*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALFWEAR, INC.<br><br>            Plaintiff,<br>v.<br><br>KULE, LLC<br><br>            Defendant. | Case No. 2:23-CV-00412-DAK-CRM<br><br>**DEFENDANT KULE, LLC'S MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF ROB WALLACE**<br><br>Judge Dale A. Kimball<br>Magistrate Judge Cecilia M. Romero<br><br>**DEMAND FOR JURY TRIAL** |

Pursuant to FRE 402, 403, and 702, Defendant Kule LLC ("Kule") moves the court for an order excluding the survey, report, and related testimony from Rob Wallace as unreliable and unduly prejudicial.

I.  **INTRODUCTION**

Kule is a nationally-recognized fashion brand that sells stylish apparel under the brand name KULE ("the KULE mark"). Kule is based in New York, and its clothing can be found in stores such as Bergdorf Goodman, Bloomingdale's, Barneys, Neiman Marcus, and Nordstrom. Plaintiff Alfwear, Inc. ("Alfwear") is a Utah outdoor apparel company that sells rugged, technical apparel under the trademarks KÜHL and KUHL ("the KÜHL marks"). See *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, 2023 WL 5765891, at *11 (10th Cir. Sept. 7, 2023) ("Alfwear's product is outdoor apparel and gear.") Alfwear alleges that the KULE Mark infringes the KÜHL marks. (*See* Dkt. 2.)

On March 28, 2025, Alfwear served the expert report of Rob Wallace ("Wallace Report"). (Ex. 1.) The Wallace Report details a survey ("the Survey") purportedly designed to determine if the relevant public believes the source of Kule's website is the same or affiliated with the source of Alfwear's website, thereby causing a likelihood of confusion. (*Id*. at ¶ 1.) The Survey employs a "two room Squirt based survey" format (*id.* at 6), showing participants a portion of KÜHL's home page and then showing three other partial websites, including a portion of Kule's home page. (*Id.*, ¶¶ 13–17.) The Survey asks if respondents believe any of the three websites is affiliated with or approved by the source of the KÜHL websites. (*Id.* at ¶ 39.) Mr. Wallace opines that the Survey shows confusion between the KÜHL and KULE websites. (*Id.*, ¶ 4.)

Kule's expert, Brian Sowers, produced a rebuttal report identifying the flaws in the Survey's methodology and conclusion ("the Sowers Report"). (Ex. 2.) (*Id.*) Kule now moves to exclude Mr. Wallace's Report, Survey and testimony.

## II.      ARGUMENT

The trial judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). Because expert evidence may mislead a jury, "a court weighing admissibility under Rule 403 exercises more control over experts than lay witnesses." *Mastercard Int'l Inc. v. First Nat. Bank of Omaha, Inc.*, 2004 WL 326708, at *7 (S.D.N.Y. Feb. 23, 2004). *See also Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688, at *11 (S.D.N.Y. Aug. 6, 2007) (indicating courts enjoy "wide latitude" in excluding evidence that possesses an undue risk of prejudice or confusion.).

Expert testimony must be "based on sufficient facts or data; … the product of reliable principles and methods; and … [require that] the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The district court must act as a "gatekeeper … to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Schulenberg v. BNSF Railway Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018). The Court must "determine[] whether [an] expert's opinion is reliable by assessing the underlying reasoning and methodology." *Id.* at 1282-83. The party offering the expert testimony—in this case, Alfwear—bears the burden of showing the testimony is admissible. *U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

Survey evidence merits exclusion "when its probative value is substantially outweighed by its prejudicial effect or potential to mislead the jury." *Mastercard*, 2004 WL 326708, at *7. *See also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 581 (S.D.N.Y. 2007) (substantial methodological flaws warranted exclusion under Rule 403 and 702). The Court may

3

consider various factors when determining survey reliability, including whether the universe was properly chosen/defined, the sample was representative, and the questions asked were clear and nonleading. *Hodgdon Powder Co. v. Alliant Techsystems, Inc.*, 512 F.Supp.2d 1178, 1181 (D. Kan. 2007). "[W]hile methodological flaws in a survey generally raise questions of weight rather than admissibility, questions of weight, when sufficiently accumulated, become so serious as to require exclusion." *Louis Vuitton*, 525 F. Supp. 2d at 563 (internal quotations omitted).

Here, the Survey is fatally flawed because it (a) utilized an inappropriate Squirt format, (b) did not approximate real-world purchasing conditions, (c) did not properly choose or define the relevant population, and (d) utilized leading questions. Thus, the probative value of the Survey and any testimony relying on the Survey is substantially outweighed by their prejudicial effect and should be excluded.

  **A. The Squirt Format Was Inappropriate**

In the Tenth Circuit, "[i]t is axiomatic in trademark law that 'side-by-side' comparison is not the test." *Jordache Enter., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1487-88 (10th Cir. 1987) (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir. 1983) (citations omitted)). Instead, "the court must determine whether the alleged infringing mark will be confusing to the public when singly presented." *Poison Spider Bicycles, Inc. v. TAP Mnf'g, LLC*, 2018 WL 836364, *3 (D. Utah Feb. 12, 2018) (citing *King of the Mtn. Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999)).

In a Squirt survey, the expert witness generally shows participants the parties' marks and/or products and asks questions to determine if there is confusion. *See* Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 TMR 739, 749–50 (2008) (discussing the

types of Squirt surveys); McCarthy on Trademarks and Unfair Competition § 32:174.50 (5th ed. Supp. 2023); Parks LLC v. Tyson Foods, Inc., 863 F.3d 220, 233 (3rd Cir. 2017). Fundamentally, a Squirt survey runs afoul of Tenth Circuit precedent that marks must not be presented side-by-side, but instead singly. A Squirt survey like Wallace's naturally violates the *Beer Nuts* and *Jordache* prohibition on side-by-side comparison. Perhaps for this reason, Kule is unaware of any instance where the 10th Circuit cited to *Squirt* as authority for survey methodology. In contrast, the Tenth Circuit affirmed a district court's "distrust" of a side-by-side survey in Water Pik, Inc. v. Med-Systems, Inc. 726 F.3d 1136, 1147 (10th Cir. 2013).

The *Eveready* format, in contrast, has become the "gold standard" for likelihood of confusion surveys. *See* Swann, 98 TMR Rep. 739. But despite Alfwear's allegations that the KÜHL marks are "well known" and "famous" (*See* Dkt. 2, ¶¶ 41-42), Mr. Wallace elected to use the Squirt format. Professor McCarthy explains that "a Squirt survey is more likely to produce a higher level of perception that the marks identify the same or related sources." McCarthy, supra § 32:174 (5th ed.) Thus, given the choice between the Eveready and Squirt formats, Mr. Wallace chose the format that would be most likely to skew the results in a manner favoring Alfwear's litigation position. Thus, his Survey should be viewed with skepticism and excluded in light of the additional issues addressed below.

  **B.** **The Survey Relied on Manufactured Proximity**

The Squirt format is only appropriate when "the tested marks … with appreciable frequency, exist in physical or temporal proximity in the marketplace." Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC, 2019 WL 7376782, at *3 (S.D. Fla. Sept. 26,

2019) (citing Swann, 106 TMR at 743). Otherwise, there is a danger that the survey has created an "artificial marketplace," which diminishes a survey's reliability. *Id.* at *6.

Mr. Wallace fails to show frequent, actual proximity between the parties' marks and/or goods in the marketplace. Mr. Wallace's only "evidence" of proximity are Google searches he purportedly conducted in "Incognito" mode. Ex. 1, Wallace Report, ¶ 16 and Ex. C. His search terms included the marks KÜHL and KULE with various clothing descriptive terms. Ex. 1, Wallace Report, ¶ 17-18 and Ex. C. However, during Mr. Wallace's deposition, Kule's counsel repeated identical searches for the KÜHL mark with various descriptive terms, and none of those searches showed KÜHL-branded products and KULE-branded products in close proximity. Ex. 3, Wallace Deposition, 102:14-115:17. Kule's expert witness, Mr. Sowers, performed similar searches and did not see any results for both parties' goods. (Ex. 2, ¶ 34, Appendix H.) The fact that Mr. Wallace's searches could not be replicated indicates that the parties' goods are not naturally found in proximity and that the Squirt format was inappropriate. *Pinnacle*, 2019 WL 7376782, at *6 (excluding a survey that "created an artificial marketplace instead of replicating actual market conditions.").

Furthermore, many of Mr. Wallace's search results were the result of Alfwear purchasing the mark "KULE" as a keyword so that Alfwear's KUHL products would appear in sponsored search results. Ex. 3, Wallace Deposition, 98:14-22. One example is shown below:

6



Ex. 1, Wallace Report, ¶ 15. The word "Sponsored" above the KÜHL result shows that the KÜHL website was not returned organically, but as part of Alfwear's own marketing efforts. Thus, Mr. Wallace also relied on artificial conditions created by Alfwear (i.e., Alfwear's purchasing of the trademark KULE as a keyword), not on organic searches as they would be performed by consumers. This further casts doubt on the proximity of the parties' respective goods and weighs against the reliability of the Survey.

### C. The Survey Utilized Leading Questions

The Survey asked improper leading questions that presupposed a connection between the marks. "[C]ourts have disapproved of the use of leading questions in the context of the *Squirt* survey method." *Saxon Glass Technologies, Inc. v. Apple Inc.*, 393 F.Supp.3d 270, 288–89 (W.D.N.Y. 2019). This is because "[a] survey question that begs its answer by suggesting a link between plaintiff and defendant cannot be a true indicator of the likelihood of consumer confusion." *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 488 (5th Cir. 2004). When a survey asks whether two products are made by the same or a related source, it is likely to "bias

the survey by suggesting to participants, at least implicitly, that they should believe there is at least some sort of relationship between the different items when the possibility might not even have occurred to the vast majority of consumers who see the items." *Simon Prop. Group, L.P. v. mySimon, Inc.*, 104 F.Supp.2d 1033, 1048 (S.D. In. 2000).

Since its inception, Squirt's use of closed-ended and leading questions has been criticized by courts and commentators because of the suggestive nature of those questions. *See, e.g.*, Richard J. Leighton, Using Daubert-Kumho Gatekeeping to Admit and Exclude Surveys in Lanham Act Advertising and Trademark Cases, 92 TMR 743, 781 (August 2002). Numerous courts have found that "[a] survey question that begs its answer by suggesting a link between plaintiff and defendant cannot be a true indicator of the likelihood of consumer confusion." S*cott Fetzer Co. v. House of Vacuums Inc.,* 381 F.3d 477, 488 (5th Cir. 2004) (citing *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984)). *See also* Water Pik, 726 F.3d at 1147-48; *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 465-66 (E.D. Va. 2017), *aff'd*, 707 F. App'x 138 (4th Cir. 2017).

For example, in *Kargo*, participants were asked:

[D]o you think these ads from Premiere Magazine and for the cell phone service you just saw...?
[1] do come from the same company that put out the magazine you looked at earlier in the survey[,]
[2] do not come from the company that put out the magazine you looked at earlier in the survey[,]
[3] Don't know.

*Kargo*, 2007 WL 2258688, at *5. The court found that these yes-or-no questions "suggested to respondents that they should believe that a connection existed between the companies' marks." *Id*. at *9.

The Survey showed a small portion of the KÜHL website, followed by three additional websites (Kule's website, Johnnie-O's website, and WTAPS website). (Ex. 1, Wallace Report, ¶¶ 37, 39.) For the Kule, Johnnie-O, and WTAPS websites, the Survey asked, "Do you believe this website is from the same source as the first website you saw or is otherwise affiliated with or approved by the source of the first website you saw?" (Ex. 1, Wallace Report, ¶ 39.) Survey respondents had three choices: 1) Yes, 2) No, and 3) Don't know/Can't tell. This query is nearly identical to *Kargo*. The Survey question and response options give this Court ample reason to exclude the Survey in its entirety. See *Beneficial Corp. v. Beneficial Cap. Corp.*, 529 F.Supp. 445, 450 (S.D.NY 1982).

The Survey questions are similar to the survey questions asked in *Pinnacle*, 2019 WL 7376782 . There, the Plaintiff's expert, Mr. Wallace's testimony was excluded by the Court. The Court held

> [O]ne of the survey's only other questions stated that it would present screenshots from both Parties' websites, presented those screenshots, and then asked whether, based upon the screenshots, those companies were affiliated? … This question is … improperly suggestive … . [T]he question improperly leads the survey respondent to believe that the companies are affiliated since it introduces the screenshots with the initial question, i.e., whether the survey respondent believes the Parties' companies are affiliated, and adds that the screenshots come from the Parties' websites.

*Pinnacle*, 2019 WL 7376782 at *5 (citing McCarthy, supra § 32:172 (5th ed. 2019)). Similar to *Pinnacle*, Mr. Wallace's report and testimony should be excluded here.

      **D.**    **The Survey Did Not Approximate Real World Marketplace Conditions**

In the likelihood of confusion analysis, marks should be compared "as they are encountered by consumers in the marketplace." *Water Pik*, 726 F.3d at 1146. Accordingly, a survey "must use stimuli that approximate what a potential customer would encounter in making purchasing

decisions." *Kargo*, 2007 WL 2258688, at *10. Otherwise, a survey may "exaggerate[e] the similarities between the two marks, likely increasing the confusion of the respondents." *Water Pik*, 726 F.3d at 1146–47. A survey may be excluded on that ground alone. *Malletier*, 525 F.Supp.2d at 591; *Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) ("[C]ritical defect . . . was the failure to conduct it under actual marketing conditions."); *Kargo*, 2007 WL 2258688, at *7 ("[F]ailure to approximate marketplace conditions can provide grounds for the survey's exclusion.").

The Survey fails to replicate the actual purchasing experience of Kule's customers. First, the Survey utilized screenshots of only small portions of the home pages of the Alfwear and Kule websites. The images presented to respondents are shown below:




 

Ex. 1, Wallace Report, ¶ 37, 39. These screenshots do not approximate what potential customers may see while purchasing the products and thus are problematic.

First, the screenshots do not include the URL of each website. This does not reflect the market conditions in which consumers would typically encounter the websites because consumers can always see the URLs of the websites they visit.[1] Such an approach purposely withholds from information that might dispel confusion.

Second, by using only a small portion of home pages, Mr. Wallace did not show consumers the product pages that actually offer the parties' goods for sale. By using only the website home pages, Mr. Wallace did not approximate the conditions in which consumers actually encounter and interact with the parties' websites.

Thus, respondents in the Wallace Survey were asked to form opinions without all the relevant marketplace information that might dispel confusion. This does not accurately test for confusion, and likely results in an overestimation of the likelihood of confusion. "[T]he survey expert must make every reasonable effort to duplicate the marketplace conditions under which

---

[1] "[T]he test stimulus should faithfully represent the item *as it appears in the marketplace* …. Researchers conducting tests of stimuli appearing on the Internet need to be especially careful not to diminish the number and nature of cues associated with the test stimulus in the marketplace." Jacoby, J. (2013). Trademark Surveys Volume 1, Designing, Implementing, and Evaluating Surveys. US: American Bar Association, pp. 485-487.

consumers are likely to encounter the mark at issue… The failure to discharge this obligation will often result in the exclusion of the survey." Edwards, G. & Mayberry, J. "The Daubert Revolution and Lanham Act Surveys," Trademark and Deceptive Advertising Surveys: Law, Science, and Design, (Shari S. Diamond & Jerre B. Swann, eds. 2022), p. 354.

The failure to replicate actual market conditions renders the Survey "fundamentally unreliable" and warrants exclusion. *Malletier.*, 525 F. Supp. 2d at 595.

E.   **The Survey Did Not Properly Define the Relevant Population**

"A survey that provides information about a wholly irrelevant population is itself irrelevant. [Thus,] Courts are likely to exclude the survey or accord it little weight." McCarthy, *supra* § 32:159 (5th ed.) (citing Federal Judicial Center's 2011 Reference Manual on Scientific Evidence). *See also Apple v. Atl. Yards Dev. Co., LLC*, 2015 WL 11182422, at *7 (E.D.N.Y. 2015) ("[W]here a statistician attempts to extrapolate from unrepresentative data, his testimony is properly subject to exclusion.").

The Survey did not poll consumers who had or intended to purchase Kule's products. Rather, it surveyed a group "who had purchased stylish city clothing within the last 12 months **and** plan to do so again within the next 12 months." Ex. 1, Wallace Report, ¶ 23 (emphasis added). Mr. Wallace's screening criteria excluded individuals who have not purchased "stylish city clothing" before, but are likely to do so in the next 12 months. "In a traditional case claiming 'forward' confusion… the proper universe to survey is the potential buyers of the junior user's goods or services. Note the word 'potential.' *The focus is on prospective customers, not past customers*." Jacoby, p. 285. Failure to survey these relevant consumers merits exclusion.

12

### F. The Prejudicial Effect of Mr. Wallace's Testimony Substantially Outweighs Its Probative Value.

Where expert evidence will be presented to a jury, "[t]he court has a responsibility to the jurors not to waste their time or to make their task unduly difficult by admitting evidence that is likely to be complex and time-consuming … when it offers essentially nothing of real probative value." *Simon Prop.*, 104 F. Supp. 2d at 1039. *See also Kargo*, 2007 WL 2258688, at *12 ("live testimony of [a] highly seasoned and impressively credentialed consumer confusion expert, regarding the results of the deeply flawed [survey], would prove to be both powerful and quite misleading [to a jury]"). Survey evidence should be excluded "when its probative value is substantially outweighed by its prejudicial effect or potential to mislead the jury." *Mastercard*, 2004 WL 326708, at *7. *See also Malletier*, 525 F.Supp.2d at 581 ("[I]f the survey suffers from substantial methodological flaws, it will be excluded").

Allowing the Survey, Mr. Wallace's Report, or any related testimony would suggest a level of credibility regarding that evidence, when likelihood of confusion was tested in a manner that has serious methodological flaws. Any probative value is outweighed by the prejudice such would impose on Kule. *Malletier*, 525 F.Supp.2d at 563 ("[Q]uestions of weight, when sufficiently accumulated, become so serious as to require exclusion.").

### III. CONCLUSION

For the foregoing reasons, Kule asks the Court to exclude Mr. Wallace's Report, the Survey, and any related testimony from trial.

DATED this 5th day of September, 2025.

> WORKMAN NYDEGGER
>
> By: /s/ *Matthew A. Barlow*
>     Matthew B. Barlow
>     Brittany Frandsen
>
> *Attorneys for Kule, LLC*

## Certification

I, Matthew A. Barlow, certify that Defendant Kule, LLC's Motion To Exclude The Testimony And Opinions Of Rob Wallace contains 3,093 words and complies with DUCivR 7-1(a)(4).

/s/ *Matthew A. Barlow*