# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALFWEAR, INC., <br><br><br> Plaintiff, <br><br><br> v. <br><br><br> KULE, LLC, a New York limited liability company, <br><br><br> Defendant. | Case No. 2:23-cv-00412-DAK-CMR <br><br> Judge Dale A. Kimball <br><br> Magistrate Judge Cecilia M. Romero |

**EXPERT REPORT OF ROB WALLACE**

March 28, 2025

## I.    Introduction

1.    I was engaged by Ray Quinney & Nebeker, PC, counsel for Plaintiff Alfwear, Inc. dba KÜHL, to conduct a survey to determine if the relevant public believes that the source of the Defendant's website, https://www.kule.com, to be the same or affiliated with the source of the Plaintiff's website, https://www.kuhl.com, thereby causing a likelihood of confusion between these brands.  What follows is an initial report specifying the results of this survey and my expert opinions regarding this core issue.

2.    My opinions consider the information provided to me, as cited, publicly available information, as cited, the results of the survey findings, as cited, my over 45 years of brand

1

identity and brand communications expertise for a large number of consumer brands, as cited in Appendix 3 of this report, and my 24 years of work as an expert witness, as summarized in Appendix 4 of this report.

3.    I reserve the right to supplement my opinions based on any additional information that would affect the outcome of my work or provide greater insight into the matters examined.

## II.    Summary of Opinions: Survey results indicate relevant likelihood of confusion between the sources of the sites in question.

4.    As detailed below, the net results (primary set results minus control set results) indicate that 19.5% of the population believes that the two sites in question come from the same or affiliated/approved sources.  It is my understanding that courts most often rule on likelihood of confusion based on survey net results of 15% of the population believing that the elements in question are from the same or affiliated sources.[1]  The 19.5% net results of the survey I conducted for this matter exceeds this threshold.

## III.    Summary of Qualifications

5.    I was the Managing Partner for more than 30 years of one of the branding industry's most respected brand identity strategy and design firms, Wallace Church & Co. I am currently the Managing Partner of Best of Breed Branding Consortium, an omni-channel branding consultancy that also focuses on all the branding issues involved in this case.

---

[1] Courts will often state that a survey finding 15% or more is sufficient to support likelihood of confusion, while under 15% suggests no likelihood of confusion. *See, e.g.*, *1-800 CONTACTS, INC. v. Lens. com, Inc.,* 722 F. 3d 1229, 1248-49 (10th Cir. 2013); *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) ("The survey results themselves indicate a high possibility of confusion between Texon and EXXON. Approximately 15 percent of the individuals surveyed associated the Texon sign with EXXON.").

6.      Based on this experience, I have highly specialized knowledge of how marketers create, design and establish brands, how consumers interpret brand trade dress and brand messaging, how they develop awareness and perceptions of brands, and all the other marketing/branding issues in this case.

7.      As outlined in my Curriculum Vitae, in Appendix 3 of this report, I have been actively involved in hundreds of product design, brand naming, brand identity, and brand messaging assignments for dozens of leading consumer product and service companies. For example, my firm and I have developed brand messaging for such companies as Coca-Cola, Procter & Gamble, PepsiCo, Pfizer, Nestle, Johnson & Johnson, Target, The Home Depot, shoe and apparel companies such as Russell Athletic and more than 100 additional national and global brand owners.  As part of my experience as a brand identity strategist, I participated in developing, fielding and/or analyzing well over one thousand consumer surveys and research projects.

8.      As an expert witness, I have designed fielded and analyzed well more than 75 surveys to determine secondary meaning and or likelihood of confusion and other intellectual property infringement issues. As a result, I have the experience to qualify and quantify my opinions regarding secondary meaning and likelihood of confusion.

9.      I served on the Board of Directors of The Design Management Institute, the largest global organization in the brand design and strategy industry, for 10 years. There I founded and co-chaired the Design Value Project, which focused on determining the return on investment of brand messaging and brand identity. As such I have been referred to as "the thought leader in quantifying brand design's value." I have delivered keynote presentations on this topic at more than 50 branding industry symposia across the US, Canada, Europe, Latin

3

America and Asia. I have lectured at the graduate level at The Columbia School of Business, The SVA Masters in Branding Program, Georgetown University, University of Texas, Seton Hall, and other educational institutions. My full Curriculum Vitae is attached in Appendix 3 of this report.

## IV.    Previous Testimony and Expert Opinions

10.    My testimony and opinions have been accepted by and admitted in proceedings both before many U.S. District Courts and before the USPTO Trademark Trial and Appeal Board (also known as the "TTAB"). I have served as an expert witness on more than 90 cases concerning intellectual property infringement, trademark and trade dress infringement, false or deceptive advertising and brand messaging, and other marketing/branding industry issues. In such capacity I have designed and conducted court-compliant surveys for more than 70 of these cases. I have been deposed more than 40 times and testified in court as an expert witness more than a dozen times. My substantial experience in branding, marketing and survey development provides me with the background necessary to prepare and analyze the survey described in this report. A listing of my legal expert witness cases completed in the last 4 years is attached as Appendix 4 of this report.

## V.    Survey Design

11.    While courts review a series of other criteria to determine trademark infringement, "the strongest and most relevant evidence . . . is evidence by a public opinion survey or poll."[2] Therefore, in order to form and substantiate an opinion on the relevant

---

[2] Ink Markers, Order No. 30 at 27, *"From Trademarks to Brands"*, Deven R. Desai, 64 *Florida Law Review* 981 (2012).

likelihood of confusion between the marks in question, I designed a court-compliant survey among the relevant consuming public of past and potential future purchasers of stylish city clothes, a description that I understand represents Defendant's KULE apparel. The full survey questionnaire screen shots and its raw and tabulated results are submitted as separate documents along with this initial report.

12.     This survey was conducted between February 19 and March 6, 2025. This survey was conducted under my direction in accordance with the principles and standards delineated in the Manual for Complex Litigation, Fourth Edition, 2004, prepared for the Federal Judicial Center.[3] These principles provide the best assurance that the data collected is valid and can be relied upon to draw conclusions regarding consumer opinions.

These principles provide that:

   a.   The proper universe(s) should be properly chosen and defined;

   b.   The sample of respondents chosen from the proper universe should be representative of that population;

   c.   The questions asked should be clear and not leading;

   d.   The data gathered should be accurately reported;

   e.   The data should be analyzed in accordance with accepted statistical principles;

   f.   The surveys should be conducted by qualified persons following proper interview procedures; and

---

[3] Manual for Complex Litigation, Fourth Edition, 2004.

g. The surveys should be conducted in anticipation of litigation and by persons not connected with the parties or counsel or by persons aware of its purpose in the litigation.[4]

13.    The sample selection, questions, questionnaire design, and interviewing procedures employed in the survey are designed in accordance with the generally accepted standards and procedures to meet the criteria for survey trustworthiness detailed in the Manual for Complex Litigation.[5] This includes the choice of close-ended answers in the screener so as not to bias the respondent or make them aware of the screener criteria.

## VI.    Survey Methodology - Two Room Squirt Survey

14.    The survey design followed the protocols of a "two room Squirt based survey"[6] where the same questions were asked of a "line up" of multiple stimuli.  For the primary set, the stimuli "line up" includes the two sites in question plus two non-infringing clothing sites (WTAPS and Johnnie O).  The control set of respondents viewed the KÜHL website and a control website image replicating the Kule website but replacing the infringing Kule logo with a very similar but non-infringing Cuel logo[7]. I selected the Cuel name as the control because it is pronounced identically (or at least similarly) to how I understand Defendant asserts its KULE

---

[4] *Id*.

[5] *Id*.

[6] *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980).

[7] "In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.  *Skechers USA, Inc. v. Vans, Inc.*, No. CV-07-01703, 2007 WL 4181677, at *8–9 (C.D. Cal. Nov. 20, 2007) (in trade dress infringement case, control stimulus should have retained design elements not at issue).

mark is pronounced (i.e., rhyming with "jewel")[8] and yet does not infringe on the KÜHL trademark.  Again, the primary stimuli were separated by attention confirming questions and a "line up" of two additional non-infringing websites.

15.    Courts accept a Squirt based methodology when the sites in question can be engaged concurrently or sequentially by the same consumer during the purchase process.[9]  In order to determine this, I searched for the term "kule clothing" on Google while using a browser in Incognito mode, which extracts all cookies and search history references.  As indicated below, links to both the sites in question appear in this same search results.



---

[8]    The above citation from the Kule blogpost https://oboy.kule.com/ confirms that Defendant asserts that the Kule brand name is pronounced as rhyming with "jewel."

[9] The Squirt methodology is accepted when the marks "are simultaneously or sequentially accessible in the marketplace for comparison. It relies on the 'proximity' factors (e.g., overlapping customers, channels of trade and advertising) in a likelihood of confusion analysis." Swann, Jerre B., "Likelihood of Confusion Studies and the Straitened Scope of Squirt". The Trademark Reporter, May-June 2008, pp 755-756.

7

16.     Notably, the previous search results show kule.com and kuhl.com within the top five search results. This shows an average consumer would encounter the marks at issue, and the stimuli kule.com and kuhl.com, in close proximity in the real-world marketplace.

17.     As indicated in Exhibit C to this report, a number of Google and Google shopping tab searches that include the term "KUHL" produced results showing both KÜHL and KULE brands in close proximity to one another, within the first page of search results. These searches were done in Incognito mode with cookies extracted. These include at least the search terms "Kuhl women's shirt", "Kuhl women's clothing", "Kuhl tote bag" (shopping tab), "kuhl tote bag", "kuhl women's scarf" (shopping tab), "Kuhl tshirt", "Kuhl striped tshirt", "Kuhl striped shirt", and "Kuhl women's dresses" (shopping tab).

18.     Also as indicated in Exhibit C to this report, a number of Google and Google shopping tab searches that include the term "Kule" also produced results showing both KÜHL and KULE brands in close proximity to one another, within the first page of search results. Again, these searches were done in Incognito Mode with cookies extracted. These include at least the search terms "Kule mens",  "Kule shorts women's", "kule shorts", "women's Kule activewear", "Kule jacket", "Kule tee shirt," "Kule vest", "Kule tshirt", "Kule bag" (shopping tab), "Kule fleece", "men's Kule socks", "Kule men's clothing", "Kule dress" (shopping tab), "Kule sweater", "women's Kule sweater", "men's Kule sweater", "Kule tote bag" (shopping tab), " Kule men's activewear", and "women's Kule shirt" (shopping tab).

19.     These numerous search results that feature both brands in question are proof to me that consumers can, in fact, view and shop the KÜHL and KULE products in question during an online shopping session. Thus, because in the real-world marketplace consumers will see the

8

KÜHL and KULE marks, and kuhl.com and kule.com, in close proximity to one another, and likely in the same shopping session, I believe the Squirt-based survey is appropriate for this report.

20.     Based on my work as a branding consultant for many Fortune 500 companies, I have a detailed understating of consumer on-line purchase behavior and note that many consumers will access multiple sites in one shopping session so they can compare them.  In this frequent case, consumers see the sites in question sequentially, justifying the use of the Squirt survey methodology[10].  I also note that many online shoppers have two browsers opened so they can more accurately compare two results. In this case, the sites in question can be accessed concurrently, again justifying the use of the Squirt survey methodology.

21.     The purpose of the control stimuli was to extract any possible "survey noise", or those guessing, answering with predetermined perceptions, or providing exaggerated responses to the primary stimuli questions. In establishing "net results", the responses stating that the control CUEL site was the same as or affiliated with the KÜHL site were subtracted from those of the primary set reporting confusion between the sites in question.

## VII.    Proper Qualifying Universe

22.     Addressing operational issues, the Reference Manual on Scientific Evidence states, "One of the first steps in designing a survey or in deciding whether an existing survey is relevant is to identify the target population (or universe). The target population consists of all

---

[10] Ibid, Swann, Jerre B., "Likelihood of Confusion Studies and the Straitened Scope of Squirt". The Trademark Reporter, May-June 2008, pp 755-756.

elements (i.e., objects, individuals, or other social units) whose characteristics or perceptions the survey is intended to represent."[11]

23.     A series of screening questions were asked to confirm the proper universe of respondents. I determined that the appropriate universe for this survey would comprise 400 men and women between the ages of 21 and 65 who had purchased stylish city clothing within the last 12 months and plan to do so again within the next 12 months.  It is my understanding that this criterion defines the KULE consumer demographics.

24.      Based on my experience and credentials as a survey expert, it is my opinion that the respondents meeting this survey's screening requirements are representative of the relevant consuming public for this matter.

## VIII.   Sample Size

25.     The Reference Guide to Survey Research states, "The surveyor's job generally is easier if a complete list of every eligible member of the population is available so that the sampling frame lists the identity of all members of the target population."[12] A complete list of all members of the universe for this inquiry was obviously not available, which means that a true probability sample was not possible. That is, there does not exist an exhaustive list of every woman between 21 and 65 who meets all of the screening requirements. Therefore, a non-probability sample of 400 qualified respondents was used. Non-probability samples of this size

---

[11] Reference Manual on Scientific Evidence, Third Edition West Group, St. Paul, MN, 2011 ("Reference Manual"), prepared for the Federal Judicial Center

[12] *Id*.

are and have been used to make consequential academic and business decisions and are also accepted into evidence in courts throughout the country.[13]

## IX.    Sophistication of the Respondent Paneling and Survey Fielding Teams

26.    The survey was fielded by the internet survey firm, Illume, Inc. Illume is widely respected in the marketing research industry and has created hundreds of surveys that have been accepted by the courts and more than one thousand surveys for the marketing and branding industries. Illume programmed the study using the Sawtooth Software's Lighthouse Studio software suite, as it does to program all of its surveys. Sawtooth Software has been providing market research data collection and analysis software since 1983. It uses IBM's SPSS software for data analysis. SPSS has been widely used for over 50 years and is recognized as the forerunner in data analysis software. Illume also uses Sawtooth Software's web hosting services for hosting all of their surveys. All surveys are secure using TLS 1.2, AES with 128-bit encryption (High); ECDH_P256 with 256-bit exchange, which ensures optimal security.[14]

27.    Illume coordinated the respondent recruitment using the paneling firm Innovate MR. Innovate MR recruited respondents from a diverse blend of channels to ensure representativeness, including both online and offline publishers, social networks like Facebook, web and SMS databases, advertising networks, and television ad placement. They use a dynamic profiling system that captures and localizes data points based on geography and tracked

---

[13] https://rmsresults.com/2010/07/07/400-is-the-magic-number-market-research-in-central-ny/

[14] See http://www.illume-research.com/aboutus.html.

respondent behavior longitudinally using advanced algorithmic solutions designed to evaluate their profile on an ongoing basis, which ensures accuracy and authenticity is maintained.[15]

28.  Illume tracked the time required for each respondent to complete the survey. The data from those who completed the survey too quickly or too slowly was eliminated so as to extract "speeders" and "laggers" or those that might not have been giving the survey their full attention or getting information from outside sources.

## X.    "Double Blind" Protocol and Meeting all Acceptable Survey Standards

29.    Because of the way the questions were crafted, and because at no time were the parties' names or identities disclosed to Illume or Innovate MR, neither the survey programmer nor the respondents knew the purpose of the survey. In addition, there was no question which suggested the survey's sponsor or purpose. This "double blind" protocol means that neither the programmer nor the respondents could intentionally or unintentionally influence the results.

30.    All seven of the standards delineated in the Manual for Complex Litigation, Fourth Edition, 2004 were observed in this survey. Furthermore, the following additional safeguards were observed:

   a.    Respondents were told to answer honestly and not to guess.

   b.    Respondents who needed glasses to properly see the stimuli were required to wear them.

---

[15] https://www.innovatemr.com/panels/consumer-panel/.

c.  Respondents were told that it was permissible to have no opinion about a subject, and thus that they should not feel the need to guess at an answer nor receive any information from an outside source.

d.  A control protocol was used to account for survey "noise."

e.  If respondents had any extraordinary knowledge, e.g. if they or their family members worked at an ad agency, consumer research firm, a law firm, a computer technology or e-commerce firm, they were removed from the pool.

f.  If they were taking the survey on their phone and therefore not able to properly see the stimuli they were removed from the pool.

g.  Finally, the survey was "double blinded": neither the survey company nor the respondents knew the sponsor or the purpose of the study; thus, neither could influence the results, if even unwittingly.[16]

## XI.    Survey Screeners – Securing the Relevant Consuming Public

31.    This section summarizes the questions and findings of the survey. Please refer to the survey screener and questionnaire document that was submitted with this report, entitled Exhibit A  Kuhl Survey Print Screens.pdf.

32.    Before qualifying for these surveys by appropriately answering the screening questions, potential respondents were asked: "Do you agree to answer the questions without help or assistance, answer truthfully and not to guess?" Only those who responded "Yes" were admitted to the survey pool.  They were then asked their age and only those between 18 and 65

---

[16] Manual for Complex Litigation, Fourth Edition, 2004.

13

were admitted. Those that required reading glasses to clearly see the stimuli were required to be wearing them. Admitted respondents were then asked the screening questions that ensured they were part of the relevant consuming public of past and potential future purchasers of stylish city clothing. It asked, "[i]n the last 12 months have you purchased or been involved in the purchase of stylish city clothing, and are you planning to purchase or be involved in the purchase of this clothing in the next 12 months?" Only those that responded "Yes" to these questions were admitted into the survey.

33.    A control question was asked so that respondents were not biased into thinking that the survey was only about stylish city clothing. It read "[i]n the last 12 months have you purchased or been involved in the purchase of soccer equipment, including soccer balls, and are you planning to purchase or be involved in the purchase of a soccer equipment, including soccer balls, in the next 12 months?" All responses to this control question were accepted into the survey.

34.    Any respondent who might have extraordinary knowledge about the issues in this case was also extracted. These respondents included those that worked for, or had a family member that worked for, an advertising agency, a consumer research firm, a law firm, or a clothing manufacturing firm or retailer. Any positive responses to these questions disqualified the respondent and their data was not collected. There was also a control response, namely a soccer equipment manufacturer for which those respondents who selected it were allowed to proceed.

35.    Lastly, before the primary questions were asked, additional questions assured that the respondent could effectively see the stimuli by asking, "Are you taking this survey on…"

14

with closed ended responses being a desktop/laptop, a tablet or a phone. Those who answered "a phone" were terminated, and their data was not collected.

36.    To further ensure the accuracy of the results, the final screening question asked: "Please understand that we are only interested in your opinions or beliefs. If you don't have an opinion or belief or don't know the answer to a question, that is an acceptable answer. Do you agree not to guess or get information from the internet or any other source?" Only those that answered YES to this question proceeded with the survey.

## XII.    Survey Stimuli and Questions

37.    The following stimuli and primary questions were asked of all respondents that met the screening criteria:

Please review this website in the context of your making a clothing purchase. The survey will refer to this website as "the first website you saw."



38.    Two questions then followed to ensure that the respondent was paying close attention.  The first asked the respondent to type the word SEARCH in a text box below and the

15

second asked what month it currently is.  Only those that answered these questions correctly

proceeded with the survey.

39.    Respondents were then asked, "Please review the following three websites in the

context of you making a clothing purchase".  The following three stimuli were shown in

randomized order.







With each stimuli the question was asked:

Do you believe this website is from the same source as the first website you saw or is otherwise affiliated with or approved by the source of the first website you saw?

With the closed ended responses:

○ Yes, I believe that this site is from a source that is the same, affiliated with or approved by the source of the first site I saw.

○ No, I believe that this site is from a source that is different from, non-affiliated with and not approved by the source of the first site I saw.

○ Don't know/Can't tell

40.     Each of these questions was then followed up with the open-ended question "Why do you say that" just to affirm the validity of these responses.

41.     The control set of respondents saw the same questions with the exception of the KULE website being replaced with the following proper control stimulus.  This control

17

replicated the KULE site with the only exception of the trademark in question, replacing KULE with CUEL.



42.     The survey ended with a series of demographic questions on the level of schooling they archived, the state they live in, and their approximate yearly income.

## XIII.   Survey Results

43.     The following tabulated results charts indicate the key primary and control responses.

18

Primary question - Reviewing the sites in question:

**Q13a - Do you believe this website is from the same source as the first website you saw or is otherwise affiliated with or approved by the source of the first website you saw? KULE**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes, I believe that this site is from a source that is the same, affiliated with or approved by the source of the first | 94 | 23.5 | 47.0 | 47.0 |
| | No, I believe that this site is from a source that is different from, non-affiliated with and not approved by the source | 78 | 19.5 | 39.0 | 86.0 |
| | Don't know/Can't tell | 28 | 7.0 | 14.0 | 100.0 |
| | Total | 200 | 50.0 | 100.0 | |
| Missing | System | 200 | 50.0 | | |
| Total | | 400 | 100.0 | | |

Control Question - Reviewing KÜHL and the control CUEL site:

**Q13b - Do you believe this website is from the same source as the first website you saw or is otherwise affiliated with or approved by the source of the first website you saw? CUEL**

| | | Frequency | Percent | Valid Percent | Cumulative Percent |
|---|---|---|---|---|---|
| Valid | Yes, I believe that this site is from a source that is the same, affiliated with or approved by the source of the first | 55 | 13.8 | 27.5 | 27.5 |
| | No, I believe that this site is from a source that is different from, non-affiliated with and not approved by the source | 120 | 30.0 | 60.0 | 87.5 |
| | Don't know/Can't tell | 25 | 6.3 | 12.5 | 100.0 |
| | Total | 200 | 50.0 | 100.0 | |
| Missing | System | 200 | 50.0 | | |
| Total | | 400 | 100.0 | | |

19

When the control score of 27.5% confusion is subtracted from the primary set score of 47% confusion, the net confusion score is 19.5% of the population who confuse these sites as coming from the same or affiliated/approved sources.

44.    It is my understanding that courts traditionally require a minimum net result of 15% confusion in order to rule on likelihood of confusion.[17]  This survey's net findings of 19.5% confusion among the relevant public exceeds this threshold.

45.    Open ended responses validate these findings.  Typical open-ended responses to "Why do you say that?" among those who reported confusion include:

-":I think they share the same brand name".

- "Kuhl was on both pages"

-"The same name basically"

-"I think it is a marketing strategy to make their line look more diversified"

## XIV.    Conclusion

46.    As an expert in brand communications, the results of this court-compliant survey prove to me that there is relevant confusion between the sources of the sites in question based on the KÜHL and KULE marks and how they are pronounced.

47.    I hold these opinions within a reasonable degree of certainty based on the survey results and my 40-plus year experience in the branding industry. I respectfully reserve the right

---

[17] *1-800 CONTACTS, INC. v. Lens. com, Inc.*, 722 F. 3d 1229, 1248-49 (10th Cir. 2013); *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980)

to amend this declaration with further comments in the event that additional information becomes available.

48.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 28, 2025

_____

Rob Wallace

21

**Appendix 1:   Documents submitted with this report**

**Exhibit A:  Survey Screeners/Questionnaires**

Kuhl Survey Print Screens, pdf

**Exhibit B: Survey Results**

Kuhl Final Freqs 3-6-25.xlsx

Kuhl Final Data 3-6-25.xlsx

**Exhibit C: Google Searches**

Google Searches.pdf

### Appendix 2:   Documents Cited

*1-800 CONTACTS, INC. v. Lens. com, Inc.*, 722 F. 3d 1229, 1248-49 (10th Cir. 2013)

*Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980)

Ink Markers, Order No. 30 at 27, *"From Trademarks to Brands"*, Deven R. Desai, 64 *Florida Law Review* 981 (2012).

Manual for Complex Litigation, Fourth Edition, 2004.

*Skechers USA, Inc. v. Vans, Inc.*, No. CV-07-01703, 2007 WL 4181677, at *8–9 (C.D. Cal. Nov. 20, 2007)

*SquirtCo v. Seven-Up Co.*, 628 F.2d 1086 (8th Cir. 1980)

Union Carbide Corporation, Plaintiff-appellant, v. Ever-ready Incorporated, a corporation, and Mark Gilbert, An individual, Defendants-appellees, 531 F.2d 366 (7th Cir. 1976)." Justia Law. N.p., n.d. Web. 17 July 2017

Swann, Jerre B., "Likelihood of Confusion Studies and the Straitened Scope of Squirt". The Trademark Reporter, May-June 2008

Reference Manual on Scientific Evidence, Third Edition West Group, St. Paul, MN, 2011 ("Reference Manual"), prepared for the Federal Judicial Center

https://oboy.kule.com/

https://rmsresults.com/2010/07/07/400-is-the-magic-number-market-research-in-central-ny/

http://www.illume-research.com/aboutus.html

https://www.innovatemr.com/panels/consumer-panel/

## Appendix 3:  Curriculum Vitae of Robert Wallace

**Rob Wallace   Expert Witness: Brand identity**

917-860-0319

Rob@bestofbreedbranding.com

www.RobWallaceExpert.com

As the former managing partner of Wallace Church, Inc., one of the most recognized and accomplished brand identity strategy and design consultancies, I have more than thirty years of expertise in all aspects of branding strategy and design analysis for national and global brands. My core expertise is the ability to create and differentiate brand experiences that drive consumer awareness and purchase behavior.

Clients include Procter & Gamble, Coca-Cola, Unilever, Pfizer, Dell, Pepsico, Revlon, Target, The Home Depot, Johnson & Johnson, Bacardi, E&J Gallo, Mattel, Anheuser Busch, PNC Bank, Kroger, L'Oreal, s/Miracle Gro and more than 40 national/global consumer product marketers of equal caliber.

**Areas of Expertise:**

Trademark/Trade Dress

Package/Product Design

Licensing

Intellectual Property

Marketing Strategy

Brand Communications

Visual Brand identity

Advertising Claims

Consumer Research

Copyright Damages

Consumer Research

Planning/Analysis

24

**Industry Experience:**

| | |
|---|---|
| Food | Personal Care |
| Beverage | OTC and Rx Drugs |
| Home Products | HBA/Beauty Care |
| Wellness | Technology Brands |
| Toys/Sporting Goods | Hard Goods |
| Beer/Wine/Spirits | B to B |
| Apparel | Retailer Brands |
| Financial Services | |

**Background:**

Best of Breed Branding Consortium, LLC                    June 2014 – Present

Managing Partner

- Actively manage a consortium of branding communications consultancies.
- Provide strategic consulting on all branding issues including brand name development, brand identity, graphic and structural package design, trademark and copyright development, and integration across advertising and all other brand communications.

Wallace Church, Inc.,                    1985 – June 2014

Managing Partner, Strategy

- Actively manage one of the world's most respected brand identity design consultancies.
- Provide strategic consulting on all branding issues including brand name development, brand identity, graphic and structural package design, trademark and copyright development, and integration across advertising and all other brand communications.

Peter Cris Advertising, Inc., New York, NY                    1984 – 1985

Vice President, Marketing

- Provided both the strategic and creative force for this regional advertising agency.
- Acted as primary liaison between clients and creative department.

25

Modular Marketing, Inc., New York, NY                    1982 – 1984

Senior Account Manager

- Managed select client relationships through all creative and strategic aspects of project management for this marketing communications consultancy.

- Designed and developed brand promotion programs, corporate communications and brand identity assignments.


Grey Advertising, Inc., New York, NY                    1981 – 1982

Senior Account Manager

- Actively participated in one of the world's largest advertising agencies through the Market Horizons function, consulting with core clients on advertising and new brand communications opportunities.


**Education:**

MBA coursework, The New School, New York, NY        1981 – 1983

BA, English, Gettysburg College, Gettysburg, PA        1977 – 1981


**Professional Activities:**

- Expert speaker on brand identity design at more than 40 marketing, design and research industry events across the US, UK, Europe, Latin America and Asia

- Author of numerous articles and published case histories on brand identity design in the Wall Street Journal, Forbes, Marketing Week, Design Management Journal, Package Design Magazine and numerous other publications,

- Co-Author "Really Good Package Design Explained," Rockport Press, 09

- Lecturer on brand identity at Columbia Business School, Georgetown University, Seton Hall, University of Texas, School of Visual Arts Masters in Branding and other MBA programs of leading universities

- Board of Directors, Design Management Institute, 2010-Current

- Co-Chair of the Design Management Institute Design Value Project, 2012

26

- Distinguished Faculty Member, Path to Purchase Institute, speaker at national conference for the last 8 years
- Founder "The Strategic Design Firm Leadership Summit" BXP Live event

**Professional Memberships:**

Board of Directors, the Design Management Institute,

Co-Chair Design Value Project, the Design Management Institute

Distinguished Faculty, Path to Purchase Institute

American Marketing Association

Color Marketing Group

American Institute of Graphic Arts

## Appendix 4:  Partial List of Prior Cases

I have served as an expert witness on branding related issues on more than 95 prior occasions.  In
the last five years, I have been served on:

- GDM Enterprises, LLC (Pure Cosmetics) v Astral Health & Beauty, INC., (PUR
Cosmetics), U.S. District Court, Western District of Missouri, 2019

- BAMA ICEE LLC et al v J&J Snack Foods Corp et al., US District Court, Northern
District of Alabama, 2019

- The Black & Decker Corporation, et al v HARBOR FREIGHT TOOLS USA, INC.,
Report for Mediation, 2019

- 1231 Barrage Inc et al v. Automobile Dealers Assoc of Greater Philadelphia et al,
Philadelphia County Court of Common Pleas, 2019

- Christopher Hayden v. Eagles Nest Outfitters, Inc. et al US District Court
Western District of North Carolina, 2019

- Chantel Ray Finch v Weigh Down Workshop Ministries, Inc. et al, US District Court,
Eastern District of Virginia, Norfolk Division, 2019

- Mambu Bayoh v. AfroPunk Fest 2015, et al., U.S. District Court, Southern District of
New York, 2019

- Scorocs LLC v. Innovations for Poverty Action Inc., US District Court, Western District
of Missouri, At Kansas City, 2019

- Good L Corp v. Fasteners for Retail, Inc., US District Court, Middle District of
Tennessee, 2019

- Sunny Days Entertainment LLC v. Traxxas L.P., US District Court, District of South
Carolina Greenville Division, 2019

- Venus Et Fleur, LLC v. Affordable Luxury NY, Inc dba Pret a Fleur, et al, US Court,
Southern District of New York, 2019

- Rhino Metals Inc, v Sturdy Gun Safe Inc, US District Court, District Idaho, 2019

- American Customer Satisfaction Index, LLC v Genesys Telecommunications Laboratories, et al, US District Court, Eastern District of Michigan, Southern Division, 2020

- I.M. Wilson, Inc v Obchtchestvo S Ogranitchennoy Otvetsvennostyou "Grichko", et al, US Distinct Court, Eastern District of Pennsylvania, 2020

- Country Life v. The Hain Celestial Group, Inc, US District Court, Eastern District of New York, 2020

- New NGC, Inc, et al v. Alpinebay, Inc, US District Court, For the Northern District of Illinois, Eastern Division, 2020

- P&P Imports v. Johnson Enterprises, LLC et al, US District Court for the Central District of California, 2020

- New NGC, Inc, et al v. Alpinebay, Inc, US District Court, for the Northern District of Illinois, Eastern Division, 2020

- Otter Products, LLC et al v. Bigbirds, LLC et als, US District Court, for the District of Colorado, 2020

- Sulzer Mixpak, A.D. v. DXM Co LTD et als, US District Court, for the Southern District of New York, 2020

- Jalinski Advisory Group, Inc. v. JBL Financial Services, Inc., US District Court, for the Eastern District of Missouri, Eastern Division, 2020

- American Customer Satisfaction Index, LLC v ForeSee Results, et al, US District Court, Eastern District of Michigan, Southern Division, 2021

- Jalinski Advisory Group, Inc. v. Franklin Advisory Group, Inc., US District Court, for the Eastern District of Pennsylvania, 2021

- Restoration Hardware, Inc., *et al*., v. Bugalow Home, LLC, US District Court, for the Southern District of Ohio, Eastern Division, 2020

- American Medical Experts, LLC v. Ronny Nizar Hamad, Prime Medical Experts, LLC et al., US District Court, for the Eastern District of Virginia, 2020

29

- American Customer Satisfaction Index, LLC v ForeSee Results, et al, US District Court, Eastern District of Michigan, Southern Division, 2021

- Thrive Natural Care Inc. v. Thrive Causemetics, Inc, US District Court, Central District of California, 2021

- BMC Software, Inc v. Baker Hughes, a GE Company et al, US District Court, Southern District of California, 2021

- Abbott Laboratories, Freestyle Libre, Reexamination Trade Dress Proceedings in the United States Patent and Trademark Office (USPTO), 2021

- Orange Bang, Inc. and Monster Energy Company v. Vital Pharmaceuticals, Inc., American Arbitration Association, Los Angeles Regional Office, 2021

- Diamond Assets v Device Cycles, et al., US District Court, Western District of Wisconsin, 2021

- I&I Hair Corp v Beauty Plus Trading Co, Inc. et al., US District Court, Northern District of Texas Dallas Division, 2022

- Glam & Glitz Nail Design Inc. v. IGel Beauty, LLC, et al., US District Court for the Central District of California, 2022

- Certain Casual Footware and Packaging Thereof, et al., US International Trade Commission, Washington DC, 2022

- Simpson Strong-Tie Company, Inc v Mitek, Inc, US District Court for the Northern District of California, 2022

- Opulent Treasures, Inc v Portofino International, US District Court for the Central District of California, 2022

- Macy's IP Holdings, LLC v Aroma350, Inc., US District Court for the Southern District of New York, 2022

- Independent BDSI Owners Association et. al v. Super Bee Holdings, American Arbitration Association, 2022

- Ace Group International, LC and Ace Group Bowery LLC v. 225 Bowery, LLC, Arbitration Administered by the International Chamber of Commerce, 2022

- Woodstock Ventures et al v. Woodstock Roots, LLC., US District Court for the Southern District of New York, 2022

- Pecararo Latteria, LLC Trademark Application., United States Patent and Trademark Office, 2022

- Purple Innovation, LLC v. Responsive Surface Technology et al, U.S. District Court for the District of Utah, 2023

- Harmony Hospice Care LLC., V. Comfortbrook Hospice Et Al. Court of Appeals Eighth District Cuyahoga County Ohio, 2023

- Santa Barbara Polo Club, Inc. and Sb Members, LLC v. Lifestyle Licensing B.V. And Lifestyle Equities C.V., American Arbitration Association International Centre for Dispute Resolution, 2023

- FoxFactory v Dong Yongqiang United States Patent and Trademark Office, Trademark Trial and Appeal Board, 2024

- Rebel Athletic v. Jim Lundberg D/B/A Cs Athletic D/B/A Cheerstix et al., U.S. District Court for the Northern District of Illinois, Eastern Division, 2024

- Laguinitas Brewing Co. et al v. Solura. LLC D/B/A Bucanero, U.S. District Court for the Southern District of Florida, 2024

- Ray Scott Fuss v. Fredrick M Bensch, U.S. District Court for the Northern District of Georgia, Atlanta Division, 2024

- Enviodigm Inc v. Apple Inc, et als, Superior Court for the State of California, for the County of Santa Clara, 2024

- Skims Body, Inc v. Vaughn Associates, Inc Trademark Application., United States Patent and Trademark Office, 2024

- Deckers Outdoor v. Primark US Corp, U.S. District Court for the Northern District of Massachusetts, 2024

### Appendix 5:  Partial List of Authored Books and Articles

I have written a number of peer-reviewed brand identity articles, contributed to branding texts, and have been interviewed by The Wall Street Journal, The New York Times, and more than a dozen branding and marketing communications industry publications. I have spoken at more than 30 marketing communications and design industry events across North and South America, the UK, Europe and Asia.  I have lectured on brand identity at Columbia Business School, Georgetown University, The University of Texas, and other leading universities. I have conducted webinar events with more than 1,600 participants on the topic of design process and design thinking.

I was on the Board of Directors of the Design Management Institute, the most prominent global design industry association, and I co-chair its Design Value Project. I am a Distinguished Faculty Member of the Path to Purchase Institute.  Please see my current CV for a listing of these and other accomplishments.

I coauthored a book entitled "Really Good Packaging Explained", released in 2009 by Rockport Publishers.  I was also a contributing author with Robin Landa and the book" Build Your Own Brand", Rockport, 2013.  I also wrote the forward to Christopher Durham's book, "52 The My Private Brand Project", Folio28, 2014

In the past 15 years I have written the following articles:

- "The Tropicana Trouble and How It May Have Been Prevented", Package Digest, 2009
- "Blood, Sweat and Tiers, Building Optimal Brand Identity Architectures", GAIN, AIGA Journal of Business and Design, June 2008
- "Heinz Turns Iconic Authenticity into Fresh Relevance", The Hub, September 2007
- "Design ROI Envisioned", Step Inside Design, July/August 2007
- "Be Smart Be Simple", Design Management Review, Spring 2006
- "Proving our Value: Measuring Package Design's Return on Investment", Design Management Journal, Summer 2001

- "The High Cost of Saving Money", Package Digest, Summer 2000
- "Icons, Your Brand's Visual Essence, Brandweek, Spring 2000

I have coauthored an article with Pamela De Cesare, former Associate Director of Package Communications, Kraft Foods, Inc., entitled "Amazing Pace, Shared Views on the Design Process", Design Management Journal, Spring 2000.

In the past several years I have posed more than two dozen articles and posts on Wallace Church's web site: http://wallacechurch.tumblr.com/ these include but are not limited to:

- "Quantifying Design's Value"

- "Design RI Re-Envisioned",

- "Cutting through the Sea of Sameness"

- "Architecting a Brand Experience"

- "The National Color" and more

I am the founder of the Linked In Group- "Relevant Disruption in Branding" https://www.linkedin.com/groups?home=&gid=7422931 where I have posted more than 10 articles including:

- "Right Here, Right NOW!"

- "Fashion Touchdown"

- "Color is Key"

- "Cool Customization"

- "Relevance for Right Now"

- "Shape Language"

- "Visual Vampires"

_____