## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **Alfwear, Inc.,** <br>       **Plaintiff,** <br><br> v. <br><br> **Kule, LLC, a New York limited liability company** <br><br>       **Defendant.** | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:23-cv-00412-DAK-CMR <br><br> Judge Dale A. Kimball <br><br> Magistrate Judge Cecilia M. Romero |

This matter is before the court on Defendant Kule's Motion for Summary Judgment [ECF No. 46], Plaintiff Alfwear's Motion for Partial Summary Judgment [ECF No. 52], Defendant's Motion to Exclude the Testimony and Opinions of Rob Wallace [ECF No. 43] and Plaintiff's Motion to Exclude Opinions of Brian M. Sowers [ECF No. 40]. On April 22, 2026, the court held a hearing on the parties' summary judgment motions [ECF Nos. 46 and 52]. At the hearing, Plaintiff was represented by S. Brandon Owen, Adam Kenji Richards, Stephanie H. Soh and Lydia Rytting, and Defendant was represented by Brittany Frandsen and Matthew A. Barlow. The court took the motion under advisement. After carefully considering the memoranda filed by the parties and the law and facts pertaining to the motion, the court issues the following Memorandum Decision and Order.

## BACKGROUND

Defendant Kule is a New York City based clothing brand that sells apparel under the trademark KULE. Defendant was founded in 2001 by fashion designer Nikki Kule and sold primarily children's clothing but also sold clothing for women and men using the KULE trademark. In 2003, Defendant registered and began using the domain name "kuleshop.com." In

1

2004, Defendant began filing for federal trademark protection for the KULE marks, obtaining the following federal registrations for apparel or retail apparel stores:

- Reg. No. 4076588 for the mark "Kule," registered December 27, 2011 (canceled July 8, 2022).

- Reg. No. 4265663 for the mark "KULE," registered December 25, 2012.

- Reg. No. 3350076 for the mark "KULE by Nikki Kule," registered December 4, 2007 (canceled July 11, 2014).

- Reg. No. 4191610 for the mark "Kule," registered August 14, 2012.[1]

Around 2010, Defendant discontinued its children's clothing line and began focusing on women's clothing.

Plaintiff Alfwear is a Utah performance and lifestyle apparel company. Plaintiff has been selling men's and women's apparel under the mark KÜHL since 1993. Plaintiff is the owner of the following trademarks presently at issue (collectively the "KÜHL marks"):

- Reg. No. 3916866 for the mark KÜHL, registered February 8, 2001.

- Reg. No. 4441177 for the mark KUHL, registered November 26, 2013.

- Reg. No. 1990375 for the mark **kühl** registered July 30, 1996 (the "**kühl** Design Mark").

After continuous use for five years, Plaintiff filed a Declaration of Incontestability with the United States Patent and Trademark Office (USPTO) for the '866 registration. On March 18, 2017, the USPTO issued a Notice of Acknowledgement Under Section 15 stating that "[t]he

---

1 While Defendant's other trademarks were for retail clothing items, this registration was primarily for leather and imitation leather goods, namely backpacks, handbags, purses, trunks, traveling bags, umbrellas, parasols, walking sticks, whips, harnesses and saddlery.

declaration of incontestability filed for the ['866] registration meets the requirements of Section 15 of the Trademark Act, 15 U.S.C. § 1065."

Defendant maintains that due to a clerical error, the trademark registration number 4076588 for the Kule mark was accidentally abandoned in 2022 and the USPTO rejected efforts to revive it. Defendant claims that it promptly filed for a new application to register its Kule mark. Plaintiff objected to the new application.  Plaintiff sent a letter to Defendant claiming that the Kule mark was likely to cause confusion with Defendant's KÜHL marks and demanded that Plaintiff abandon its pending trademark application and change the name of its company. Plaintiff refused to comply with Defendant's demands.

Plaintiff sued Defendant for trademark infringement under 15 U.S.C. § 1114, unfair competition under 15 U.S.C. §1125, and common law unfair competition.  As part of its litigation strategy, Plaintiff hired Rob Wallace as an expert witness. Defendant hired Brian M. Sowers as an expert to offer rebuttal to Mr. Wallace's opinions. The parties filed competing motions to exclude the other's expert witness reports.

Defendant filed a motion for summary judgment as to Plaintiff's claims asserting that Defendant's laches defense bars Plaintiff's claims and that no jury could find a likelihood of confusion between Plaintiff's and Defendant's marks.  Plaintiff filed its own motion seeking summary judgment on the following: (1) Plaintiff has a protectable interest in the KÜHL marks; (2) Defendant's cancellation counterclaim fails as a matter of law; and (3) some of Defendant's affirmative defenses fail as a matter of law.

**Expert Reports**

Rule 702 of the Federal Rules of Evidence "imposes an important 'gate-keeping' function with regard to the admissibility of expert opinions." *Mathis v. Huff & Puff Trucking, Inc.*, 787

F.3d 1297, 1307 (10th Cir. 2015) (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).  The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant." *Daubert v. Merrel Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993). The court "must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

To support its likelihood of confusion claims, Plaintiff retained Rob Wallace to conduct a consumer survey measuring whether relevant consumers believe that Defendant's website (https://www.kule.com) originates from, is affiliated with or is otherwise connected to Plaintiff's website (https://www.kuhl.com) (the "Wallace Report"). (Ex. 1, ECF No. 43). Defendant retained Brian M. Sowers to rebut the Wallace Report (the "Sowers Report"). (Ex. B, ECF No. 40).  Both Wallace and Sowers were disclosed as expert witnesses.  Each party seeks to exclude the opposing expert's report in whole or in part.

*The Wallace Report*

Wallace designed a two-room Squirt based survey.[2] He determined that use of the Squirt methodology was appropriate because the parties' websites can be engaged concurrently or

---

2 See *SquirtCo. v. Seven-Up Co.,* 628 F.2d 1086 (8th Cir. 1980).

sequentially by the same consumer during the purchasing process. Wallace made this determination by conducting a Google search for the term "kule clothing" in Incognito mode with cookies extracted. (Ex.1 ¶ 15, ECF No. 43).  The search produced links to both parties' websites within the first page of search results. (*Id.*).

The Wallace online survey was programmed and hosted by the internet survey firm Illume, Inc. The survey was double blind, as neither the programmer nor the respondents knew the purpose of the survey. It was comprised of 400 men and women between the ages of 21 and 65 who had purchased stylish city clothing within the last 12 months and planned to do so again within the next 12 months. All respondents answered affirmatively that they would be truthful, had purchased stylish city clothing in the past and intended to do so in the future, were taking the survey on a desktop or laptop and agreed not to guess at answers or use extraneous information outside the survey itself.

The survey was conducted by asking the same questions relating to a line-up of multiple stimuli.  For the primary set, the stimuli line up included both parties' websites and two additional clothing sites. The control set of respondents viewed Plaintiff's website and a control website image replicating Defendant's website but replacing the allegedly infringing KULE logo with a similar "Cuel" logo.  Mr. Wallace selected Cuel as the control name because it is pronounced similarly to how Defendant argues KULE is pronounced, rhyming with "jewel." The control set was designed to extract those respondents that were guessing, answering with predetermined perception or providing response to the primary stimuli questions.

All respondents that met the screening criteria were shown the following:

Please review this website in the context of your making a clothing purchase. The survey will refer to this website as "the first website you saw."



(*Id.* at ¶ 37). Respondents were then shown the following images in randomized order and asked

- Please review the following websites in the context of you making a clothing purchase.







(*Id.* at ¶ 39). With each image the question was asked: Do you believe this website is from the same source as the first website you saw or is otherwise affiliated with or approved by the source of the first website you saw?  The respondents could then chose from the following responses: (1) Yes, I believe that this site is from a source that is the same, affiliated with or approved by the source of the first site I saw; (2) No, I believe that this site is from a source that is different from, non-affiliated with and not approved by the source of the first site I saw; (3) Don't know/Can't tell. Each of these questions was followed by asking "Why do you say that" to affirm the validity of the responses.

The control set of respondents saw the same question with the KULE website replaced with the control stimulus CUEL.



(*Id*. at ¶ 41). The survey ended with a series of demographic questions.

The survey found the net confusion score is 19.5% of the population who confuse the parties' sites as coming from the same or affiliated sources. Based on these results, Mr. Wallace concluded that there is relevant confusion between the parties' sites based on their marks and how they are pronounced. (*Id.* at ¶ 43-44).

"To determine whether expert testimony is admissible requires a trial court to examine 'whether the reasoning in methodology underlying the testimony is scientifically valid.'" *Kodiak Cakes, LLC v. JRM Nutrasciences*, LLC, 2022 WL 1734066, at *9 (D. Utah 2022) (quoting *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1233 (10th Cir. 2005)). "To assess the validity and reliability of a survey, a court should consider a number of criteria, including whether: (1) the universe was properly chosen and defined; (2) the sample was representative of that universe; (3)

the survey's methodology and execution were in accordance with generally accepted principles; (4) the questions were leading or suggestive; and (5) the data was accurately gathered and supported." *Water Pik, Inc. v. Med-Systems, Inc.,* 2012 WL 202782, at *4. "A survey is admissible if it is 'material, more probative on the issue than other evidence and if it has guarantees of trustworthiness.'" *Alfwear v. IBKUL Corp.,* 2025 WL 1370694, at *12 (D. Utah 2025) (quoting *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.,* 83 F.3d 1533, 1544 (10th Cir. 1993)).

Defendant contends that the Wallace survey should be excluded because it utilized a Squirt format which exposes respondents to the parties' marks in a side-by-side manner. Defendant argues that this methodology fails to replicate actual marketplace conditions, where consumers generally encounter the marks separately rather than in close proximity. In Defendant's view, an Eveready survey[3] would provide a more reliable measure of likelihood of confusion because it more closely resembles the way consumers encounter the parties' marks and products in the marketplace.

Both the Eveready and Squirt formats are widely accepted methodologies for measuring likelihood of confusion. *See SquirtCo. v. Seven-Up Co., 628 F.2d 1086* (8th Cir. 1980); *Union Carbide Corp. v. Ever-Ready, Inc.,* 531 F.2d 366 (7th Cir. 1976). The choice between those methodologies depends upon the manner in which consumers are likely to encounter the parties' marks in the marketplace rather than any categorical preference for one format over the other. See Jerre B. Swann & R. Charles Henn Jr., *Likelihood of Confusion Surveys: The Ever-Constant Eveready Format; the Ever-Evolving Squirt Format*, 109 Trademark Rep. 671, 680-81 (2019). Disagreement concerning the appropriate survey format ordinarily goes to the weight of the

---

3 See 6 McCarthy on Trademarks and Unfair Competition § 32:174 (5th ed.)

evidence rather than its admissibility. *See Fortune Dynamic, Inc. v. Victoria Secret Stores Brand Management, Inc.,* 618 F.3d 1025, 1036 (9th Cir. 2010).

Moreover, Mr. Wallace did not employ a traditional Squirt survey in which the respondents viewed the parties' marks simultaneously. Rather, he utilized a two-room Squirt format.  Under that methodology, respondents were first exposed to one party's website and then shown the other party's website before being asked confusion questions.  The separation of the stimuli reduced the risk that respondents infer an association merely because the survey itself presents the marks together.

Mr. Wallace further explained that he selected a Squirt format because internet searches for the parties' brands returned search result pages displaying links to both parties' websites. Defendant disputes that conclusion and notes its expert was unable to replicate those searches. However, such disagreement presents a factual dispute regarding marketplace conditions, not a basis for exclusion.

Defendant next argues that the survey employed leading questions. "A survey question that begs its answer by suggesting a link between plaintiff and defendant cannot be a true indicator of a likelihood of consumer confusion." *Water Pik, Inc.,* 726 F.3d at 1147. Specifically, Defendant objects to the survey question that asked respondents whether they believed the second website was from the same source or affiliated with the first website. Defendant claims this question led the respondents to answer that they believed a connection existed between the parties' websites.  The court is unpersuaded.

The challenged question mirrors the central inquiry in a trademark infringement action-whether consumers are likely to be confused as to source, sponsorship, or affiliation. Furthermore, the survey did not rely solely upon respondent's selections of a close-ended

11

response.  After answering the confusion question, respondents were asked an open-ended follow-up question, "Why do you say that?" which allowed them to explain the basis of their answers.  Such follow-up questions are commonly employed to distinguish confusion attributable to the parties' marks from confusion attributable to other factors. *See* McCarthy on Trademarks and Unfair Competition § 32:174.

More importantly, Mr. Wallace employed a control designed to measure and remove any survey noise attributable to the survey format itself. The use of a control is generally regarded as an important indicator of survey reliability.  *See* Shari Seidman Diamond, Reference Guide on Survey Research, 359, 401-02 (3d ed. 2011). If the survey format itself prompted respondents to identify a common source, that tendency would be expected to appear in both the test and the control group.  The purpose of the control is to isolate and subtract precisely that type of survey-induced response.  Accordingly, Defendant's objections are properly addressed through cross-examination and competing expert testimony rather than exclusion.

Defendant also contends that the survey failed to replicate marketplace conditions because respondents viewed screenshots depicting only portions of the parties' websites and were not shown the websites' URLs. According to Defendant, consumers visiting the parties' websites would ordinarily see the corresponding domain names and the omission of that information rendered the survey unreliable. Plaintiff contends that the URLs were intentionally excluded because it believed this inclusion could introduce an additional source identifying cue and thereby influence respondents' answers.  Whether that judgment was correct is not a question for the court under Rule 702.

The relevant inquiry is whether the decision reflects a reasoned methodological choice rather than an arbitrary departure from accepted survey principles.  Moreover, survey evidence

12

need not perfectly recreate actual marketplace conditions to be admissible. 6 McCarthy on Trademarks and Unfair Competition § 32:163 (5th ed.). Whether additional webpage content or URLs should have been included is a proper subject for cross-examination but does not render the survey unreliable.

Finally, Defendant challenges the survey universe because it included consumers who had purchased Defendant's products within the previous twelve months and intended to purchase them again, while excluding consumers who had not previously purchased Defendant's products but intended to do so in the future. Such criticisms concern the breadth of the survey universe and generally affect the weight given the survey rather than its admissibility. *See IBKUL Corp.*, 2025 WL 1370694, *14.  Defendant has not demonstrated that the selected universe was so disconnected from the relevant purchasing public as to render the survey unreliable due to serious and pervasive errors.

The court concludes that Defendant's objections concern the persuasiveness of the Wallace Report, not its admissibility under Rule 702. Therefore, the motion to exclude the Wallace Report is denied.

*The Sowers Report*

In response to the Wallace Report, Defendant hired Brian M. Sowers to prepare a rebuttal report critiquing Mr. Wallace's survey methodology and conclusions. Mr. Sowers also conducted his own likelihood of confusion survey using the Eveready format. Mr. Sowers chose the Eveready format because he believed it more closely approximates what the relevant consumers would encounter in the actual marketplace.  (Ex. B at ¶ 38, ECF No. 40). The Sowers survey screened for individuals who were likely to purchase or to be involved in the purchase of stylish city clothing in the next 12 months.

After the initial screening questions, respondents were assigned to either the test group or the control group.  The test group respondents saw the same KULE webpage used in the Wallace survey except the entire webpage was available for respondents to see and the webpage image contained the URL of the website.  The control group respondents saw the same webpage, except the KULE mark was replaced with CUEL. Respondents were then asked a series of questions about the websites including:

Who or what company do you believe makes or puts out the clothing on the site?

What other brands, products or services, if any do you believe are made or put out by the company that makes or puts out the clothing on this site?

Do you believe the company that makes or puts out the clothing on the site does or does not have a business connection or affiliation with another company?  Those who answered affirmatively to this question were asked – With what other company/companies do you believe the company that makes or puts out the clothing on this site has a business connection or affiliation?

With what other company/companies do you believe the company that makes or puts out the clothing on this site has a business connection or affiliation?

Do you believe the company that makes or puts out the clothing on the site did or did not need permission or approval from another company?  If respondents answered yes to this question they were then asked – From what other company/companies do you believe the company that

makes or puts out the clothing on the site needed permission or approval?

After each question the respondents were also asked – "Why do you say that?" The survey ended with a series of demographic questions.  Based on the results of the survey, Mr. Sowers found a net confusion level of 0.0% and concluded that it was his understanding that courts have found this percentage to be below the level to be probative of likelihood of confusion. (*Id.* at ¶ 93).  Mr. Sowers also noted that no respondent in either the control group or test group identified Alfwear or KÜHL by name to any survey question.

Plaintiff filed a motion to exclude portions of the Sowers Report, specifically paragraphs 28-31 and 33-37. Plaintiff contends that Mr. Sowers exceeded the scope of his expertise as a survey researcher by opining on the apparel market, consumer purchasing behavior, search-engine functionality and the categorization of the parties' products. Plaintiff further argues that the Sowers survey should be excluded because it employs an underinclusive survey universe and was not conducted in a double-blind manner. The court disagrees.

Federal Rule of Evidence 702 permits testimony from a qualified expert if the expert's specialized knowledge will assist the trier of fact and the testimony is based upon sufficient facts and reliable methods. *Daubert,* 509 U.S. at 592-93. The court's gatekeeping role is not intended to supplant the adversary process.  As the Supreme Court has explained, "[v]igorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means" of challenging expert testimony. *Id.* at 596. As a survey expert, Sowers may critique Wallace's choice of a Squirt format, his survey universe, his assumptions regarding marketplace proximity, and the basis for his reliance on Google search results.  Those opinions fall squarely within the scope of rebuttal testimony and survey

15

methodology. *See Fortune Dynamics, Inc.,* 618 F.3d at 1036-38 (holding that alleged flaws in survey design generally affect weight rather than admissibility).

Plaintiff's argument that Mr. Sowers is unqualified to discuss Google's incognito mode or search results is unpersuasive. Mr. Sowers does not purport to offer expert testimony regarding Google's algorithms. Rather, he challenges the factual basis for Wallace's conclusion that consumers encounter the parties' marks in sufficient proximity to justify a Squirt survey. Likewise, Mr. Sowers does not purport to offer independent opinions regarding apparel merchandising, consumer shopping behavior or the structure of the apparel industry. Rather, those opinions are offered as part of his critique of the Wallace survey methodology and assumptions underlying Wallace's survey design.

Plaintiff also seeks to exclude Sowers's Eveready survey on the ground that Mr. Sowers failed to establish that the KÜHL mark is sufficiently well known to justify use of that methodology. The court disagrees and finds Plaintiff's reliance on *Kreation Juicery, Inc. v. Shekarchi,* 2014 WL 7564679, at * 7 n. 4 (C.D. Cal. Sept.17, 2014) unavailing.

The court in *Kreation Juicery* observed that the Eveready format is generally most appropriate where the senior mark enjoys substantial marketplace recognition. *Id.* Even assuming that proposition is correct, the record reflects a genuine dispute regarding the degree of recognition enjoyed by the KÜHL mark. Plaintiff itself contends that the mark is commercially strong and widely recognized. Whether those facts justify use of an Eveready survey presents a methodological disagreement between experts, not a basis for exclusion.

Plaintiff's remaining objections likewise go to weight, not admissibility. As discussed, challenges to survey universes generally affect the persuasiveness of a survey rather than its admissibility. *See Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 615 (9th Cir. 1989).

16

Plaintiff objects to the exclusion from the survey respondents who did not identify as male or female but Plaintiff has not shown that excluding these respondents rendered the survey incapable of assisting the trier of fact. Nor does the court find exclusion warranted because the survey was not formally double blind. The survey was administered electronically, respondents were not informed of the survey's purpose, and there is no evidence that respondents were aware of the survey sponsor or received cues regarding desired responses.  Any alleged shortcomings in the survey's administration are proper subjects for cross-examination.

Rule 702 does not require the court to determine which expert is correct. Ultimately, Plaintiff's motion identifies disagreements with Mr. Sowers's assumptions, methodology and conclusions. Such criticisms are appropriately explored through cross-examination and competing expert testimony. Because Plaintiff has not demonstrated that Mr. Sowers employed an unreliable methodology or ventured so far beyond his expertise as to render his opinions inadmissible, Plaintiff's motion to exclude the challenged portions of the Sowers' rebuttal report is denied.

## STANDARD OF REVIEW

"A party is entitled to summary judgment if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC,* 935 F.3d 1112, 1114 (10th Cir. 2019) (citing *Hobbs ex rel. Hobbs v. Zenderman*, 579 F.3d 1171, 1170 (10th Cir. 2009)). "An issue is genuine, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Sally Beauty Co., Inc. v. Beautyco, Inc.,* 304 F.3d 964, 971 (10th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "The party seeking summary judgment bears the initial burden of

17

demonstrating an absence of a genuine issue of material fact." *Id.* "The nonmoving part is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Water Pik, Inc.,* 726 F.3d at 1143.

## DISCUSSION

### I. Defendant's Motion for Summary Judgment.

Defendant argues it should be granted summary judgment on Plaintiff's claims based on two reasons.  First, Defendant argues that Plaintiff's claims are barred by laches.  Second, Defendant asserts that there is no likelihood of confusion between the parties' marks.

### Laches

"The doctrine of laches originated in equity and allows the court to deny relief to a party who has slept on its rights to the detriment of its opponent." *Navanjo Nation v. Urban Outfitters, Inc.,* 2016 WL 347534, at *1 (D.N.M. Mar. 31, 2016) (citing *Biodiversity Conservation Alliance v. Jiron,* 762 F.3d 1036, 1090 (10th Cir. 2014). "As an affirmative defense, the party asserting laches must prove each element." *Id*. To prove laches the defendant must show "(1) inexcusable delay in instituting suit, and (2) resulting prejudice to defendant from such delay." *Brunswick Corp. v. Sprint Reel Co*., 832 F.2d 513, 523 (10th Cir. 1987).

In general, the delay period begins when a plaintiff knew or should have known of the alleged infringing conduct. *General Motors Co. v. Urban Gorilla, LLC*, 2010 WL 5395065, at *20 (D. Utah Dec. 27, 2010). The parties acknowledge that the Tenth Circuit has not expressly articulated the precise standard governing constructive knowledge in the trademark context. Defendant argues that constructive knowledge should be assessed through a variety of factors,

18

including the openness of the alleged infringing use, physical offices and nationwide marketing by the alleged infringer, a plaintiff's efforts to police its mark and the existence of trademark registration. In support, Defendant relies primarily on authority from outside the Tenth Circuit. *See Toyota Jidosha Kabushiki v. Aliments Lexus Inc.,* 2004 WL 1304054, at *6 (E.D.N.Y. June 14, 2004); *McDonald's Corp. v. Druck & Gerner, DDS., P.C.,* 814 F. Supp. 1127, 1137 (N.D.N.Y. 1993); *Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.,* 2007 WL 2914452, at *3 (2d Cir. Oct. 5, 2007); *F.D.I.C. v. Homestead Mortg. Co.,* 2010 WL 5420279, at *16 (E.D. Mich. Dec 27, 2010); *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.,* 894 F.3d 1015, 1025 (9th Cir. 2018).

Plaintiff, by contrast, contends that to establish constructive knowledge, Defendant must demonstrate "that it must be inconceivable that [a plaintiff] could have remained in the dark as to the alleged infringement." *Hornady Mfg. Co. v. DoubleTap Ammunition, Inc.,* 835 F. Supp. 2d 1150, 1154 (D. Utah 2011). The court finds Plaintiff's position more persuasive. As discussed in *Hornaby*, "where on summary judgment, constructive notice is claimed by a party that would bear the burden of persuasion at trail, the initial burden of proof essentially imposes an inconceivability standard." *Id.* Therefore, to meet its initial burden, Defendant "must show that, based in its evidence (treated as though it is uncontested), no reasonable juror could find that [Plaintiff] did not know about [Defendant's] use of the [] mark." *Id.*

Defendant argues that Plaintiff knew or should have known of Defendant's use of the KULE mark since the early 2000s because Defendant's use of the mark has been obvious and open for decades. Specifically, Defendant points to evidence that it registered its business in 1997 and has sold apparel under the Kule mark since 2001.  Defendant further notes that its apparel has been featured in prominent nationwide publications as early as 2002. Defendant also

19

sold apparel through major fashion boutiques and department stores and opened a physical store in New York City in 2013. In addition, Defendant registered its domain name "kuleshop.com" as early as 2003, consistently uses the KULE mark on its site and obtained multiple trademark registrations incorporating the KULE mark.

While these facts demonstrate that Defendant has openly used the KULE mark in commerce for many years, they do not establish that Plaintiff knew or should have known of Defendant's use.  The relevant inquiry is not whether Defendant's use was theoretically discoverable, but whether it would have been inconceivable for a reasonably diligent trademark owner to remain unaware of them. Defendant has not made that showing. The mere fact that Defendant operated publicly and advertised nationally does not compel the conclusion that Plaintiff necessarily encountered or reasonably should have encountered Defendant's marks. Modern commerce contains thousands of competing brands, retailers, websites and trademark registrations.  Even extensive commercial activity does not create automatic constructive notice to every trademark holder that a potentially similar mark exists somewhere in the marketplace. Nor does federal trademark law impose upon trademark owners an unceasing duty to monitor every publication, retailer, website, tradeshow or trademark filing that conceivably implicate their marks. *See QS Wholesale, Inc. v. Rox Volleyball, Inc.,* 2015 WL 4484219, at *7 (C.D. Cal. 2015).

Defendant also emphasizes Plaintiff's history of aggressively enforcing its trademarks, noting that Plaintiff has sent numerous cease-and-desist letters to alleged infringers and has initiated multiple trademark infringement actions. This evidence, however, cuts both ways. If anything, Plaintiff's enforcement history tends to support its contention that, had it discovered Defendant's use earlier, it likely would have acted sooner. Rather than establishing constructive

knowledge, Plaintiff 's enforcement efforts lend support to its assertion that had it promptly pursues perceived infringement when it becomes aware of it.

Defendant further argues that Plaintiff should have known of Defendant's use when Plaintiff attempted to register the mark KUL in August 2012. That application was rejected in part because of a likelihood of confusion between Defendant's registered KULE mark. Plaintiff did not respond to the USPTO rejection, and the application was subsequently abandoned. (Ex. A, ECF No. 95).

This argument is unpersuasive. As discussed, the laches period begins when "the plaintiff knew (or should have known) of the allegedly infringing conduct." *General Motors*, 2010 WL 5395065, at *20. Stated differently, "[a]ny delay attributable to a plaintiff must be measured from the time the plaintiff knew or should have known that infringement had ripened into a provable claim." *Big O Tires, Inc. v. Bigfoot 4X4, Inc.,* 167 F. Supp. 2d 1216, 1229 (D. Colo. 2001); *See Kason Indus., Inc. v. Component Hardware Group,* 120 F.3d 1199, 1206 (11th Cir. 1997) ("[D]elay is to be measured from the time at which the plaintiff knows or should know she has a provable claim of infringement.") Knowledge of trademark registration is not equivalent to knowledge of infringing use. Trademark registrations exist in the abstract; infringement claims arise from marketplace conduct. Defendant has provided no evidence that Plaintiff was aware of Defendant's use of the KULE mark. Instead, Defendant asks the court to impute constructive knowledge solely because it may have been aware of Defendant's trademark registration. The court declines to do so.

Plaintiff asserts that it first became aware of Defendant's allegedly infringing KULE mark in December 2021. In August of 2022, Plaintiff sent Defendant a cease-and-desist letter, demanding that Defendant stop using the KULE mark. On January 3, 2023, Plaintiff filed a

Notice of Opposition to Defendant's application to register the mark KULE asserting a likelihood of confusion between the parties' marks. Plaintiff then commenced this action on June 26, 2023.

Thus, less than two years elapsed between Plaintiff's discovery of Defendant's allegedly infringing use and the filing of this lawsuit. Such a delay is insufficient to support a laches defense. As the Tenth Circuit has held, "[a] two year delay does not itself constitute laches." *Big O Tires*, 167 F. Supp. 2d at 1229; *see Piper Aircraft Corp. v. Wag-Aero, Inc.,* 741 F.2d 925, 933 ("[T]wo years has rarely, if ever, been held to be a delay of sufficient length to establish laches.").

Accordingly, the court concludes that Defendant has failed to establish unreasonable delay necessary to support its laches defense. The undisputed evidence demonstrates that Plaintiff acted within a relatively short period after discovering Defendant's allegedly infringing use. Because Defendant cannot satisfy the knowledge and delay elements of laches as a matter of law, the court denies Defendant's motion for summary judgment on its laches defense and grants Plaintiff's motion for summary judgment as to Defendant's affirmative defense of laches.

**Trademark Infringement**

Defendant next argues that Plaintiff's use of the KULE mark constitutes infringement of its registered trademarks in violation of the Lanham Act. Section 32 of the Lanham Act allows a trademark owner to bring an infringement action against any person who

> use[s] in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake or to deceive…

15 U.S.C. § 1114(1)(a). Specifically, Defendant contends that Plaintiff has failed to show there is

a likelihood of confusion between the parties' marks.

"Likelihood of confusion forms the gravamen for a trademark infringement action." *King of the Mountain Sports, Inc. v. Chrysler Corp.,* 185 F.3d 1084, 1089 (10th Cir. 1999). Whether there is confusion between marks "is a question of fact, but the court may grant summary judgment in appropriate circumstances." *Water Pik, Inc.,* 726 F.3d at 1143. "Courts retain an important authority to monitor the outer limits of substantial similarity within which a jury is permitted to make a factual determination whether there is a likelihood of confusion." *King of the Mountain Sports, Inc.,* 185 F.3d at 1089 (quoting *Universal Money Centers, Inc. v. American Tel. & Tel. Co.,* 22 F.3d 1527, 1530 n. 2 (10th Cir. 1994)). "Of course, summary judgment is not appropriate if the nonmovant demonstrates a genuine issue of material fact regarding the likelihood of confusion." *Big Dog Motorcycles. L.L.C. v. Big Dog Holdings, Inc.,* 402 F. Supp. 2d. 1312, 1325 (D. Kan. 2005).

In determining whether likelihood of confusion exists between two marks, The Tenth Circuit considers the following factors:

[1] The degree of similarity;

[2] The intent of the alleged infringer in adopting its mark;

[3] Evidence of actual confusion;

[4] Similarity of products and manner of marketing;

[5] The degree of care likely to be exercised by purchasers; and

[6] The strength or weakness of the marks.

*Sally Beauty,* 304 F.3d at 972. "These factors are interrelated and no one factor is dispositive."

*Id.* (citing *King of the Mountain Sports, Inc.,* 185 F.3d at 1089).

*Similarities between the Marks*

"The similarity of the marks is the 'first and most important factor.'" *Elevate Fed. Credit Union v. Elevations Credit Union*, 2022 WL 798901, at *17 (D. Utah Mar. 16, 2022) (quoting *Hornady*, 746 F.3d at 1001). "The Court must consider the marks' similarities in sight, sound and meaning," *Id.* The court must also compare the marks "as a whole as they are encountered by consumers in the marketplace." *Water Pik, Inc.,*726 F.3d at 1155. "[E]ven if two marks are identical, if they are encountered in different contexts in the real-world marketplace, then the consumer can often easily distinguish between the two products associated with the marks, and any degree of similarity between the marks amounts to very little in terms of confusion." *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.,* 2023 WL 5765891, at *6 (10th Cir. 2023). "However, 'a lower degree of similarity is required when the marks are placed on closely related goods.'" *IBKUL Corp.,* 2025 WL 1370694, at *37 (quoting *Affliction Holdings LLC,* 935 F. 3d at 1115).

Defendant maintains its marks differ from Plaintiff's. Notably they are spelled differently, KULE and KÜHL.  Plaintiff's mark also uses and umlaut over the letter "u" and typically appears with a shield and a mountain. In contrast Plaintiff's mark uses occasional blue and red accents. Moreover, the marks are pronounced differently.  Plaintiff's mark is pronounced "c-o-o-l" and Defendant pronounces its mark to rhyme with "jewel" or "mule." Furthermore, Defendant argues the marks do not mean the same thing.  The KÜHL mark means that Plaintiff's "clothes and gear may actually protect the consumer from cold, inclement weather and that its clothing is hip or stylish." *Mast-Jaegermeister*, 2023 WL 5765891 at *7.  Plaintiff's mark KULE is the company's founder's name.

However, despite the differences, there are significant similarities between the marks. Both marks contain four letters, beginning with "KU" followed closely by "L."  Both marks

appear most frequently as capital letters in bold typeface. Both marks primarily use shades of

cobalt blue, white and black and are arranged in an even line. Although Plaintiff's mark is often

displayed with its separately trademarked mountain shield it is also used alone as, KÜHL. Even

when used together with the mountain shield, the most dominant and significant feature is the

word KÜHL. *See Synoptek, LLC v. Synaptek Corp.,* 309 F. Supp. 3d 825, 838 (C.D. Cal. 2018)

("[I]n a composite mark comprising a design and words, the verbal portion of the mark is the one

most likely to indicate the origin of the goods to which it is affixed.").



(Pl.'s Opp'n at 45, ECF No. 73).



(Def's Mot. Summ. J. at ¶ 28, ECF 49).



(*Id.* at ¶ 16).

Although Defendant contends its mark is pronounced with a "K" sound to rhyme with "jewel" both marks can be, and commonly are, pronounced "cool." It is difficult to distinguish between the word cool and Kule (rhyming with jewel) even when pronounced correctly and most customers will encounter the marks in print form without the benefit of having instruction on the proper pronunciation of Ms. Kule's name. Furthermore, Defendant encourages its customers to pronounce "KULE" as "cool" as demonstrated by advertising such as: "Have a KULE summer," "A very "KULE" couple, "Kule people do cool things," "Very kule stocking stuffers," "Have a kule yule," and "Find something KULE for everyone." (Ex. EE, ECF No. 71).

In terms of meaning, both parties' marks connote "cool" products, as in hip or stylish. The KÜHL marks suggest a double meaning of cool in temperature and clothing that is hip and trendy. While KULE's mark comes from the name of its founder it is also used to connote trendiness. Marks can have more than one meaning and there is overlap in the meaning between the parties' marks.  Because the marks look similar, sound similar and share a similar meaning, this factor favors Plaintiff.

*Intent of the Alleged Infringer*

The second factor is the intent of the infringer in adopting the mark. "The proper focus under [the intent] factor is whether [Defendant] had the intent to derive benefit from the reputation or goodwill of plaintiff." *Sally Beauty*, 304 F.3d at 973. "Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion." *Id*. (citing *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 941 (10th Cir. 1983)). "Conversely, if the evidence indicated a defendant did not intend to derive benefit from a plaintiff's existing mark, this factor weighs against the likelihood of confusion." *Heartsprings, Inc. v. Heartspring, Inc.,*143 F.3d 550, 556 (10th Cir. 1998).

26

Plaintiff provides no evidence that Defendant sought to copy Plaintiff's name to benefit from its reputation. There is no dispute that Defendant's company name was selected because it was named after its founder, Nikki Kule. Plaintiff argues as the non-moving party that this factor should be weighed in its favor or considered a neutral factor in the court's analysis. However, as instructed by the ruling in *Heartsprings,* the court finds this factor weighs in favor of the Defendant.

*Evidence of Actual Confusion*

The third factor considers evidence of actual confusion. Evidence of actual confusion is often recognized as "the best evidence of likelihood of confusion*." Elevate Fed. Credit Union,* 2022 WL 798901 at *19.  However, "evidence of some actual confusion does not dictate a finding of likelihood of confusion." *Universal Money Centers, Inc. v. Am.Tel. & Tel. Co.,* 22 F.3d 1527, 1535 (10th Cir. 1994). "This is because a likelihood of confusion requires a probability of confusion not the mere possibility of confusion." *Mast-Jaegermeister,* 2023 WL 5765891, at *8 (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998)). "[I]solated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis." *Water Pik,* 726 F.3d at 1150. Evidence of actual confusion "may be introduced through surveys, although their evidentiary value depends on the methodology and questions asked." *Sally Beauty*, 304 F.3d at 974.

As evidence of actual confusion, Plaintiff points to one of Defendant's mailers that was mistakenly sent to Plaintiff's offices asking to be removed from the mailing list. A second instance of confusion occurred when a Walmart listing featured a dress sold as "Kuhl Women's Turtleneck Short Mini Dress." Plaintiff claims the item was actually a KULE dress belonging to Defendant. A third instance was a text message produced by Plaintiff with a picture of a KULE

catalog and the message, "WTH, Imposters!"  These instances are the definition of *de minimis* and alone do not demonstrate actual confusion.

Plaintiff relies primarily on the Wallace Report as evidence of actual confusion. Defendant, however, reiterates its criticisms of the Wallace survey discussed above and points to the rebuttal report and survey conducted by its own expert, Brian Sowers, which found no meaningful likelihood of confusion between the marks.

Although the court has concluded that both surveys are admissible, several aspects of the survey methodology diminish the probative value of their findings.  First, Wallace employed a two room Squirt survey, exposing respondents to Plaintiff's website before directing them to Defendant's website and then asking whether they believed the two were affiliated. While simultaneous or sequential exposure may be appropriate where consumers are likely to encounter competing marks in close proximity in the marketplace, the record provides only limited support for that premise here. Wallace justified his use of a Squirt methodology by noting that a Google search for either party's mark coupled with a clothing item produced links to both parties' websites. The court is not persuaded that this rationale strongly supports the use of a Squirt survey under the circumstances presented.

The fact that a search for "KUHL pants," or "KULE pants" returns links to both parties' websites demonstrates only that the websites may appear together when a consumer searches for either party's name.  It does not necessarily establish that consumers shopping for apparel ordinarily encounter the marks in close marketplace proximity. Indeed, a consumer searching for either party's mark is already familiar with the brand and is specifically seeking information about that company or its products, making confusion less likely.  Moreover, by requiring respondents to view Plaintiff's website immediately before viewing Defendant's website, the two

room format artificially heightened the salience of the first mark in a manner that may not reflect ordinary consumer experience. Evidence that consumers searching for generic apparel related terms routinely encountered both parties' marks during the purchasing process would provide a stronger basis for concluding that a Squirt format survey accurately replicated marketplace conditions, but the Wallace Report contains little evidence of such circumstances.

Conversely, Plaintiff contends that the Sowers survey should be afforded little weight because Mr. Sowers employed an Eveready format based largely on Plaintiff's own assertion that its mark is famous and widely recognized in the marketplace. According to Plaintiff, Defendant cannot simultaneously deny that the KÜHL mark is famous for purposes of the merits while relying on the mark's alleged fame to justify use of an Eveready survey. Plaintiff therefore contends that Defendant failed to establish the factual predicate necessary for the Eveready methodology, namely that KÜHL is sufficiently well known among relevant consumers to serve as a top of mind identifier.

Neither party's survey evidence provides particularly strong support for its position. The Wallace survey employed a two room Squirt format despite only limited evidence that consumers ordinarily encounter the parties' marks in the close proximity assumed by that methodology. Conversely, the Sowers survey employed an Eveready format notwithstanding a genuine dispute regarding the extent to which the KÜHL mark is sufficiently well known among relevant consumers to justify that approach. While the court has considered both surveys, the methodological concerns discussed above reduce their respective probative value. Moreover, despite years of concurrent use of the parties' marks in the marketplace, Plaintiff had produced little evidence of actual consumer confusion outside the survey context. Accordingly, the court concludes that the competing survey evidence largely offsets itself and, when coupled with the

absences of meaningful evidence of actual marketplace confusion, this factor weights in the Defendant's favor.

*Similarity of Products and Marketing*

The fourth factor considers the similarity of the products and manner of marketing. "The greater the similarity between the products and services, the greater the likelihood of confusion." *Universal Money Centers, Inc.,* 22 F.3d at 1532 (quoting *Exxon Corp. v. Texas Motor Exch.,* 628 F.3d 500, 505 (5th Cir. 1980)).  "The issue is not whether the goods and services can be distinguished from each other on some aspect, but instead it is whether consumers would believe that one entity produced both." *Elevate Fed. Credit Union*, 2022 WL 798901, at \*20. This factor is analyzed "by separately considering (1) the similarity of the products and (2) the similarity in the manner of marketing the products." *Sally Beauty,* 304 F.3d at 974.  "The possibility of confusion is greatest when products reach the public by the same retail outlets." *Beer Nuts, Inc.,* 711 F.2d at 941. However, to demonstrate similarity between products a plaintiff is not required to show "that the allegedly infringing products be available on the same shelves as the plaintiff's product." *Id.* at 975.

Plaintiff's founder, Kevin Boyle, testified that Plaintiff makes "casual sportswear that is technical and high performance." (Ex. 18, Boyle Depo., 198:20-22, ECF No. 47).  Defendant argues it does not sell outdoor technical apparel but fashion apparel.  Defendant's former president, Jim Kuerschner, stated KULE's products "are not rugged.  They are not waterproof. They have no, like, spandex in them.  They have no sweat-wicking properties." (Ex.1, Kuerschner Depo., 95:23-25, 96:3-5, ECF No. 50). Most of Defendant's clothing is dry clean only and "certainly [is] not to be put in the dryer." (*Id.*, 97:3-4) Defendant argues the products do not overlap.

30

Moreover, Defendant argues that although they both distribute apparel, they are not competitors because they market and promote their goods differently. Defendant's products appear in fashion magazines like Vogue, Glamour and Harper's Bazaar and it sells its products on its website and in high-end retail shops. (Def.'s Mot. Summ. J. at 29, ECF No. 49). Plaintiff sells its products through its website, at its retail stores and wholesale partners such as REI, Scheels and Paragon. *Id.* Plaintiff attends trade shows like Outdoor Retailer, Nation's Best Sports and Grassroots/Connect. *Id.* Defendant rarely attends trade shows.

Although the parties' products are not identical in every respect, substantial similarities exist between them. Both parties sell many of the same categories of apparel including outerwear, short-sleeved and long-sleeved T-shirts, sweaters, hoodies, shirts, jeans, dresses and other clothing items. The products are sufficiently similar in appearance, function and intended use that consumers could reasonably view them as competing offerings within the same market. Indeed, many of the parties' garments are difficult to distinguish based solely on general characteristics.

The overlap extends beyond product categories. Both parties promote clothing designed for everyday wear and active lifestyles, often emphasizing similar functional attributes such as lightweight construction, durability, comfort and stretch. These shared features increase the likelihood that consumers will perceive the products as originating from the same source or from affiliated companies.

Defendant's broader product line, including luxury and fashion-oriented items, does not eliminate the significant overlap between the parties' goods. Trademark law does not require that the parties' products be identical. Rather, the relevant inquiry is whether consumers are likely to encounter the goods under circumstances that could give rise to confusion. Likewise,

31

Plaintiff's emphasis on technical outdoor apparel does not diminish the fact that both parties sell numerous categories of clothing that directly compete in the marketplace.

Although the parties utilize different retail distribution channels-Defendant's products appearing in luxury and fashion oriented retailer and Plaintiff's products appearing in outdoor and performance apparel stores-their marketing and sales channels significantly overlap. Both parties maintain robust e-commerce platforms through which consumers can purchase products directly. Both also market their goods through social media campaigns, influencer partnerships, digital advertising, email and direct-mail marketing, and other forms of apparel promotion.

Additionally, both parties use similar imagery to advertise their clothing. While it is true that Plaintiff's imagery is often more outdoor focused than Defendant's, both companies use outdoor and sports imagery to market their clothing.

 

(Pl.'s Opp'n at 59, ECF No. 73)



*(Id.)*



*(Id.* at 9)

 

*(Id.* at 60)

The existence of some distinct retail outlets and trade shows does not negate the substantial convergence in the parties' overall marketing efforts.  Modern consumers increasingly discover and purchase apparel online rather than through brick-and-mortar retailers.  Consequently, consumers are likely to encounter the parties' products through the same digital channels, advertisements, social media content, and online marketplaces, even if the products are ultimately sold through different retail stories.  This overlap in marketing methods and channels of trade increases the likelihood that consumers will be exposed to both brands in similar contexts and supports a finding that the parties compete for the attention of the same potential purchasers.  Accordingly, the similarities of the parties' products, target consumer, and marketing channels weigh in favor of Plaintiff under the fourth factor.

*Degree of Care*

The fifth factor relates to the degree of care likely to be exercised by the consumers. "A consumer exercising a high degree of care in selecting a product reduces the likelihood of confusion." *Sally Beauty*, 304 F.3d at 972.  "'Buyers typically exercise little care in the selection

35

of inexpensive items that may be purchased on impulse and a higher degree of care with

expensive items." *General` Motors Co.,* 2010 WL 5395065, at *19. "However, courts should not

take a 'price-determinative approach,' but should 'focus on the consumer's degree of care'…and

ask whether the item is one which is commonly 'purchased on an impulse.'" *IBKUL Corp.*, 2025

WL 1370694, at *33 (quoting *Hornaby,* 746 F.3d at 1007).

Plaintiff acknowledges that some consumers may exercise a heightened degree of care

when purchasing its more expensive technical apparel. Nevertheless, Plaintiff argues that

because it also sells moderately priced items such as water bottles, mints, hats, socks, sunscreen

and soap, customers generally exercise little care when purchasing its products. Plaintiff further

contends that, although many of Defendant's products command premium prices, Defendant

describes its apparel as "'grab-and-go' items to be purchased with a $2,000 handbag and $1,000

pair of shoes." (Pl.'s Opp'n at 63, ECF No. 73). According to Plaintiff, Defendant's consumers

likewise exercise little care when purchasing Defendant's apparel.

The court is not persuaded by either argument.  First, the mere fact that Plaintiff offers

some relatively inexpensive products does not establish that consumers exercise little care when

purchasing all of Plaintiff's goods.  More importantly, the lower-priced items identified by

Plaintiff are not the products that allegedly give rise to the likelihood of confusion at issue in this

case.  The relevant inquiry is the degree of care exercised by consumers purchasing the products

that compete in the marketplace, not ancillary items that bear little relation to the alleged

infringement.

Second, Plaintiff's argument regarding Defendant's consumers is inconsistent with its

position elsewhere in the likelihood of confusion analysis.  Plaintiff repeatedly contends that the

parties target overlapping consumers and compete in many of the same markets. Yet, for

purposes of the consumer-care factor, Plaintiff attempts to characterize Defendant's customers as luxury-fashion purchasers whose buying decisions are made with little deliberation. Plaintiff cannot simultaneously argue that the parties share the same consumer base while also treating Defendant's customers as a distinct class of purchasers for purposes of this factor.

In fact, the record suggests that customers of both parties exercise a relatively high degree of care when making purchasing decisions. Many of Plaintiff's products retail for approximately $100-$300, while Defendant's apparel commands even higher price points, including sweaters retailing for approximately $600, pants for $400 and trench coats for $500. These are the types of products consumers do not purchase on impulse. Rather, consumers are likely to devote meaningful attention to factors such as quality, fit, functionality and brand reputation. Therefore, this court finds, as other courts have, that customers exercise a heighted degree of care when purchasing Plaintiff's products, particularly those that allegedly compete with Defendant's. *See IBKUL Corp.,* 2025 WL 1370694, at *34 (finding it likely "that most consumers would research and weigh their options before purchasing Alfwear's high-priced, specialized apparel and other gear."); *Mast-Jägermeister,* 2021 WL 364109, at *7, aff'd 2023 WL 5765891, at *13 (finding because of Alfwear's high quality clothing consumers "likely exercise a high degree of care when purchasing Alfwear's products"). Accordingly, this factor weighs in favor of Defendant.

*Strength or Weakness of the Marks*

The sixth factor assesses the strength and weakness of the marks. "The stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion." *Limitless Worldwide, LLC v. AdvoCare Intern., LP,* 926 F. Supp. 2d 1248, 1253 (D. Utah 2013). Conversely, "if a mark is weak, use of a similar mark even on similar goods is unlikely to cause

confusion if minor differences distinguish one party's mark from another." *Water Pik,* 726 F.3d at 1151. "Strength has two aspects: conceptual strength, or the mark's place on the spectrum of distinctiveness, and commercial strength, or its level of recognition in the marketplace." *Id*.

A mark's conceptual strength is evaluated by its degree of distinctiveness. The degrees of distinctiveness ranging from weakest to strongest are: generic, descriptive, suggestive, arbitrary and fanciful. *See Hornaby*, 746 F.3d at 1007. "Only suggestive, arbitrary, and fanciful marks are considered strong and distinctive in and of themselves and do not need to acquire a secondary meaning to warrant protection as trademarks." *Mast-Jaegermeister,* 2023 WL 576589, at *14.

Plaintiff argues its KÜHL mark is at least suggestive. Defendant agrees, citing the Tenth Circuit's decision in *Mast-Jaegermeister* upholding the district court's reasoning that the KÜHL mark was "at least suggestive" because it "vaguely suggests that Alfwear's clothing products are appropriate on cold or chilly outdoor environments, and that its apparel is cool, hip and stylish." *Id*. Similarly, the court concurs that the KÜHL mark is at least suggestive on the distinctiveness scale and therefore, conceptually strong.

The parties dispute whether the KÜHL mark possess significant commercial strength. Commercial strength refers to the mark's marketplace recognition and the extent to which consumers associate the mark with a particular source. *See King of the Mountain*, 185 F.3d at 1093. "[A] mark with conceptual strength may ultimately be weak if its commercial strength is negligible." *Water Pik,* 726 F.3d at 1153. In assessing commercial strength, courts consider: "direct evidence, such as consumer surveys or testimony from consumers, and circumstantial evidence regarding: (1) the length and manner of the mark's use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product

38

or venture." *Id.* at 1154.

Plaintiff contends that its mark is commercially strong. Plaintiff points to nearly 30 years of continuous use, more than $1 billion in sales of KÜHL-branded products and distribution through approximately 2,600 retail locations nationwide, including major outdoor retailers. Plaintiff further asserts that KÜHL is the top-selling clothing brand at Scheels stores, outperforming several nationally recognized competitors. Additionally, from 2010 through 2024 Plaintiff spent more than $144.5 million on marketing and promotional efforts, accumulated millions of views on its YouTube channels, and has been featured in publications frequently identifying KÜHL as a leading outdoor apparel brand. Plaintiff also notes that some celebrities have been photographed wearing KÜHL-branded clothing and emphasizes its effort to police and enforce its trademark rights, arguing that successful enforcement helps preserve a mark's distinctiveness and commercial strength.

Defendant responds that courts evaluating similar evidence have previously concluded that the KÜHL mark lacks substantial commercial strength. Defendant notes that both *Mast-Jaegermeister* and *IBKUL* found that raw sales and advertising figures, standing alone provide limited insight into commercial strength absent meaningful context regarding the relevant market and competitors. *See Mast-Jaegermeister,* 2023 WL 576589, at *15-16; *IBKUL*, 2025 WL 1370694, at *31-32. In an apparent effort to address that concern, Plaintiff offers evidence that its sales exceeded those of competitors such as Black Diamond, Mountain Headwear and prAna. Defendant objects to use of these figures as they were not produced during fact discovery. Even assuming the court considers this evidence, its probative value is limited. Plaintiff provides no basis for concluding that these companies constitute the most relevant competitors or that the selected comparisons accurately reflect the broader outdoor apparel market. Indeed, Defendant

39

identifies other competitors whose sales substantially exceed Plaintiff's, suggesting that Plaintiff's comparisons may present only a partial view of the marketplace.

More importantly, Plaintiff offers little evidence connecting its sales and marketing expenditures to actual consumer recognition of the KÜHL mark. While impressive sale figures, substantial advertising expenditures and placement in prominent retail outlets may demonstrate commercial success, they do not necessarily establish that consumers recognize the mark itself as a source indicator. "[M]arks may lack commercial strength despite evidence that the senior user's products had millions of users' and the use of well-known retailers to sell these products. This kind of evidence does not tell us whether the sales were stimulated by the mark." *IBKUL*, 2025 WL 1370694, at *31 (internal quotations omitted).

Accordingly, although the court concludes that Plaintiff's mark is conceptually strong, it has not produced sufficient evidence to establish comparable commercial strength.  Thus, this factor weighs in favor of the Defendant.

Likelihood of confusion is evaluated under the totality of the circumstances. Applying the factors identified in *Sally Beauty*, four of the six-intent of the alleged infringers, evidence of actual confusion, the degree of care exercised by consumers, and the strength of the contesting mark-weigh in favor of Defendant. However, the similarities between the marks, marketing, and products establish a dispute of material fact. The court finds that Defendant has not met its burden of proving no reasonable juror could find a likelihood of confusion between the marks KÜHL and KULE. Accordingly, Defendant's motion for summary judgment on Plaintiff's trademark infringement claim is denied.

## II. Plaintiff's Motion for Partial Summary Judgment

Plaintiff seeks partial summary judgment as to (1) an element of its trademark

infringement claims; (2) Defendant's Cancellation Counterclaim; and (3) certain of Defendant's affirmative defenses.

### *Protectable Interest*

"To establish [a] claim for trademark infringement, [a plaintiff] must show: (1) that the plaintiff has a protectable interest in the mark; (2) that the defendant has used an identical or similar mark in commerce; and (3) that the defendant's use is likely to confuse consumers." *John Bean Tech. Corp. v. B GSE Grp., LLC,* 480 F. Supp. 3d 1274, 1313-14 (D. Utah 2020).  Plaintiff seeks summary judgment on the first element of a claim for trademark infringement–that it has a protectable interest in the KÜHL marks.

"Registration on the principal register…is prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the good or service specified in the certificate." *Matal v. Tam,* 582 U.S. 218, 226-27 (2017). Once a mark has been registered for five years it can become "incontestable." *Id.* at 227.  A registered mark becomes incontestable after, (1) the registered mark has been in continuous use for a five-year period after the date of registration and (2) the mark's owner files an affidavit with the USPTO. *See* 15 U.S.C. § 1065.  Subject to certain specified defenses and defects, once a mark becomes incontestable, the registration is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b).

Plaintiff argues it has a protectable interest in its three marks at issue here, specifically the marks, KÜHL, **kühl** Design Mark and KUHL.  Plaintiff must establish that it has a protectable interest in each of its three marks independent of each other.

41

*KÜHL mark*

Plaintiff was issued U.S. Trademark Registration No. 3,916,866, on February 8, 2011, for the mark KÜHL (words only) for Belts; Bottoms; Hats; Jackets; Pants; Shirts; Shorts; Tops in International Class 025.  On January 16, 2017, and after continuous use for five years, Plaintiff filed a Declaration of Incontestability for the KÜHL mark. The USPTO acknowledged Plaintiff's Section 15 Declaration of Incontestability finding that the registration satisfied the requirements of the Lanham Act. Plaintiff argues the '866 registration therefore constitutes conclusive evidence of its exclusive right to use the KÜHL mark in connections with the goods identified in the registration.

Although Defendant contends that genuine issues of material fact remain regarding whether Plaintiff has protectable interest in the KÜHL mark, Defendant fails to identify what facts are disputed, why the registration is not incontestable, or otherwise challenge the validity of the registration.  The undisputed evidence establishes that the KÜHL mark registration became incontestable on March 18, 2017, and that Plaintiff has continuously used the mark in commerce. Accordingly, the court finds that Plaintiff has established a protectable interest in the KÜHL mark.

*KUHL, kühl Design Mark and Cancellation*

Plaintiff owns U.S. Trademark Registration No. 1990375 for the mark **kühl (**words plus design) (the "**kühl** Design Mark") which issued July 30, 1996, for use in connection with rugged outdoor clothing, namely Jackets, Shirts, Pants, T-shirts and Hats in international class 025.  On November 26, 2013, Plaintiff obtained U.S. Trademark Registration No. 4441117 for the mark KUHL (words only) for, in part, Belts; Bottoms; Hats; Jackets; Pants; Shirts; Shorts; Tops in international class 025. These registrations constitute prima facie evidence of the validity of the

marks and Plaintiff's exclusive right to use the marks in commerce in connection with the goods identified in the registrations.

In addition to registration, trademark rights may arise through "us[ing] a distinct mark in commerce." *Underwood v. Bank of Am. Corp.,* 966 F.3d 1038, 1053 (10th Cir. 2021). "'[S]o long as a person is the first to use a particular mark,' that person will prevail against subsequent users of the mark." *Id.* (quoting *ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135, 147 (2d Cir. 2007). Whether a mark is protectable depends, in part, on its placement along the spectrum of distinctiveness: generic, descriptive, suggestive, arbitrary, or fanciful. Fanciful, arbitrary and suggestive marks are "inherently distinctive" and entitled to trademark protection. *See Donchez v. Coors Brewing Co.,* 392 F.3d 1211, 1216 (10th Cir. 2004). As discussed above, KUHL and the kühl Design Mark are at least suggestive and therefore, inherently distinctive.

Defendant does not dispute that the registration gives rise to a presumption of validity, ownership, and exclusive rights in the KUHL mark.  Instead, Defendant asserts it used its KULE mark in commerce before Plaintiff's KUHL mark.  However, Defendant offers no evidence supporting that assertion. By contrast, Plaintiff's registration identifies 1994 as the date of first use in commerce for the KUHL mark, several years before Defendant began selling KULE-branded products in 2001.  Because Defendant has failed to produce evidence sufficient to rebut the presumption arising from Plaintiff's KUHL registration, Plaintiff has demonstrated it has a protectable interest in the KUHL mark.

Additionally, Defendant contends that Plaintiff abandoned its use of the **kühl** Design Mark in connection with outdoor apparel and that the registration should therefore be canceled. To establish abandonment as a basis for cancellation, Defendant must demonstrate both "(1) nonuse; and (2) intent not to resume use." *Tiger Lily Ventures Ltd. v. Barclays Capital, Inc.,* 35

F. 4th 1352, 1360 (Fed. Cir. 2022). Nonuse of three consecutive years is "prima facie evidence of abandonment." 15 U.S.C. § 1127.

Not every use of a mark qualifies as trademark use under the Lanaham Act. Limited use of a mark solely for the purpose of reserving rights or avoiding abandonment is insufficient. *See Equitable Nat'l Life Ins. Co., Inc. v. AXA Equitable Life Ins. Co.,* 434 F. Supp. 3d 1227, 1241-42 (D. Utah 2020). However, "even limited use can be sufficient to avoid a finding that use of a mark has been 'discontinued' under the statute." *Tiger Lily Ventures Ltd.,* 35 F.4th at 1360.

The evidence Plaintiff provides of use of the **kühl** Design Mark as originally registered is found on stickers, bottled water, logoed vehicles and a webpage. Plaintiff provided two examples of the **kühl** Design Mark on items from Plaintiff's webpage in 2024, and one image showing it used the **kühl** Design Mark in connection with a sweatshirt sold in the 1990s.

However, Plaintiff contends it has continued to use the registered **kühl** Design Mark

through its use of the marks  and   ·  on

outdoor apparel. Plaintiff acknowledges that its current uses are not identical in form to the

**kühl** Design Mark but maintains that          KÜHL          is merely a capitalized and updated presentation of the same word mark. Plaintiff also relies on composite marks including kühl*dry,* kühl*KURVE,* kühl*air,* ICEkühl, and kühl*soft.* The use in commerce of the composite marks include a kühl*dry* label printed on an apparel item and a kühl*dry* marketing sheet explaining the benefits of the fabric.

Defendant argues that Plaintiff cannot rely on its use of the updated version or composite marks to establish continued use of the registered **kühl** Design Mark. According to Defendant,

the **KÜHL** mark and the composite marks must satisfy the requirements of tacking. The "ability to rely on an earlier form of a mark, when now using a modified version, is often called 'tacking.'" *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. HGAA v. New Millennium Sports, S.L.U.,* 797 F.3d 1363, 1367 (Fed. Cir. 2015). Tacking requires that the "previously used mark" is "the legal equivalent of the mark in question or indistinguishable therefrom, and the consumer should consider both as the same mark." *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.,* 926 F.2d 1156, 1159 (Fed. Cir. 1991). "[W]hen a trademark owner uses a modified version of its registered trademark, it may avoid abandonment of the original mark only if the modified version 'create[s] the same continuous commercial impression.'" *Jack Wolfskin,* 797 F.3d at 1369.

Defendant's argument is only partially persuasive. To the extent Defendant challenges Plaintiff's use of composite marks, those marks may present a tacking question. The addition of terms such as "dry," "air," "ice," "kurve," and "soft" could cause consumers to perceive the composite marks as identifying fabric technologies, product features, or sub-brands rather than the standalone **kühl** Design Mark. However, the court need not decide whether those composite marks independently constitute use of the registered mark.

Plaintiff's use of **KÜHL** stands on a different footing. The **kühl** Design Mark consists of the word kühl in standard characters. Plaintiff's use of **KÜHL** differs only in capitalization and typeface. Such stylistics differences do not alter the commercial impression of the mark. Consumers encountering **KÜHL** and the **kühl** Design Mark would perceive the same source identifier. *See Sand, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 955 (7th Cir. 1992)

45

("[M]inor changes in a mark which do not change the basic overall commercial impression created on buyers will not constitute abandonment."); *Sunstar, Inc. v. Aberto-Culver Co.,* 586 F.3d 487, 496 (7th Cir. 2009) ("In U.S. law, a change in a trademark's typeface is not considered a material alteration of the original mark."); *First Sav. Bank, F.S.B., v. First Bank System, Inc.,* 902 F. Supp. 1356, 1380 (D. Kansas 1995) ("Because small changes in trademark format are a minor element on which to base a drastic holding of abandonment, the courts hardly ever find abandonment where the key elements of the mark continues through new formats.").

Accordingly, Plaintiff's use of **KÜHL** on outdoor apparel constitutes use of the registered **kühl** Design Mark as a matter of law.

That conclusion defeats Defendant's cancellation claim. Abandonment requires proof of both nonuse and intent not to resume use. Because the undisputed evidence shows that Plaintiff continued to use **KÜHL** on outdoor apparel during the relevant period, Defendant cannot establish nonuse.  Nor can Defendant show intent not to resume use by relying on Plaintiff's alleged failure to use the mark in the exact form shown in the registration.  Once **KÜHL** is treated as use of the registered **kühl** Design Mark, that argument fails.

The composite mark evidence further supports this conclusion. Even if kühl*dry* and kühl*air* do not independently satisfy the strict requirements of tacking, Plaintiff's continued use of the kühl formative marks in connection with its apparel business is evidence inconsistent with an intent to abandon the **kühl** Design Mark.

Accordingly, the court concludes that Plaintiff has demonstrated the absence of a genuine dispute of material fact regarding Defendant's abandonment and cancellation claims.  Regardless of whether the composite marks satisfy the requirements of trademark tacking, the undisputed

KÜHL

evidence establishes that Plaintiff continuously used on outdoor apparel during the

relevant period. Therefore, no reasonable jury could find that Plaintiff discontinued use of the

registered mark or intended to abandon it. Plaintiff is entitled to summary judgment on

Defendant's cancellation claim and has established a protectable interest in the **kühl** Design

Mark.

**Affirmative Defenses**

Plaintiff also seeks summary judgment on Defendant's affirmative defenses of unclean

hands, no loss or damage and failure to mitigate.[4] "Generally, affirmative defenses can be

resolved on a motion for summary judgment." *Markowski v. Brigham Young University,* 575 F.

Supp. 3d 1377, 1380 n.1 (D. Utah 2022). "When a plaintiff seeks summary judgment on

affirmative defenses" they may satisfy their "burden by showing there is an absence of evidence

to support an [essential element] of the [non-moving party's] case*." Powell v. Union Pacific R.*

*Co.,* 864 F. Supp. 2d 949, 962 (E.D. Cal. 2012) (internal quotation omitted).

*Unclean hands*

"Unclean hands is a defense to a Lanham Act infringement suit." *Fuddruckers, Inc. v.*

*Doc's B.R. Others, Inc.,* 826 F.2d 837, 847 (9th Cir. 1987). The doctrine "bars relief to a plaintiff

who has violated conscience, good faith or other equitable principles in his prior conduct, as well

as to a plaintiff who has dirtied his hands in acquiring the right presently asserted." *Dollar Sys.,*

*Inc. v. Avcar Leasing Sys., Inc.,* 890 F.2d 165, 173 (9th Cir. 1989). To prevail on an unclean

hands defense, a defendant must demonstrate "[1] that the plaintiff's conduct is inequitable and

---

4 Defendant withdrew its second, third and ninth affirmative defenses, as well as acquiescence, waiver and bad faith. Additionally, Plaintiff seeks summary judgment on Defendant's laches claim. For the resons discussed in Defendant's Motion for Summary Judgment, Plaintiff is granted summary judgment against Defendant's laches defense.

[2] that the conduct relates to the subject matter of [Plaintiff's] claims." *Amusement Art, LLC v. Life is Beautiful, LLC*, 2016 WL 6998566, at *3 (C.D. Cal. Nov. 29, 2016).

Defendant contends that Plaintiff has unclean hands because, despite allegedly abandoning the **kühl** Design Mark, Plaintiff has continued to maintain the registration and has filed affidavits with the USPTO representing that the mark remains in use. According to Defendant, those representations were false and therefore constitute inequitable conduct.

The argument fails. As discussed above, the record demonstrates that Plaintiff has continued to use the **kühl** Design Mark, at minimum in a modified form that preserves its commercial impression. Accordingly, no reasonable jury could conclude that Plaintiff's representations regarding continued use of the mark were false. Absent evidence that Plaintiff knowingly made false statements to the USPTO or otherwise engaged in inequitable conduct related to the mark at issue, Defendant cannot establish the elements of an unclean hands defense. Therefore, Plaintiff is entitled to summary judgment on Defendant's unclean hands defense.

*No loss or damage*

Defendant also asserts that some or all of Plaintiff's claims are barred by the fact that Plaintiff has sustained no loss or damages as a result of Defendant's alleged conduct. According to Defendant Plaintiff has not suffered any damages, or injury in fact as required to bring any claim in Federal court. *See Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992).

The defense lacks merit. To establish trademark infringement under the Lanham Act "it is not necessary for plaintiff to plead or prove actual damage or injury in order to state a prima facie case of infringement." 4 McCarthy on Trademarks and Unfair Competition § 23:1. Rather, the injury caused by consumer confusion and the resulting loss of control over a mark's

48

reputation and goodwill constitute cognizable harms under trademark law. *See Equitable National Life Insurance Company,* 434 F. Supp. 3d at 1253. The absence of evidence quantifying monetary damages does not defeat an infringement claim.  Therefore, no reasonable jury could find that Plaintiff's claims fail for lack of loss or damages and Plaintiff is entitled to summary judgment on Defendant's affirmative defense.

*Failure to mitigate*

Defendant argues that its defense of duty to mitigate is directed to damages rather than liability and therefore should not be resolved at this stage. The court agrees that a failure to mitigate defense does not bear on whether trademark infringement occurred.  Rather the defense is directed to the extent of recoverable damages. *See Bauer Bros. LLC v. Nike, Inc.,* 159 F. Supp. 3d 1202, 1215 (S. D. Cal. 2016).  However, the fact that the defense relates to damages does not automatically preclude summary judgment. Defendant has the burden of proof for its affirmative defenses. To prevail on this defense, Defendant "must prove that [Plaintiff] could have reasonably avoided all or part of [its] claimed damages." *Nutraceutical Corp. v. NutraChamps, Inc.,* 2020 WL 6382042, at *3 (D. Utah Oct. 30, 2020).

Defendant does not identify any evidence that Plaintiff unreasonably failed to mitigate its damages or that any alleged failure increased the damages sought in this action.  While the court recognizes that mitigation is a damages-related issue, Defendant must nevertheless come forward with evidence supporting the defense.  Having failed to do so, Plaintiff is entitled to summary judgment on Defendant's affirmative defense of failure to mitigate damages.

## CONCLUSION

Based on the above reasoning, Defendant Kule, LLC's Motion to Exclude the Testimony and Opinions of Rob Wallace [ECF No. 43] is DENIED.  Plaintiff's Motion to Exclude Opinions

of Brian M. Sowers [ECF No. 40] is DENIED. Defendant's Motion for Summary Judgment is DENIED [ECF No. 46]. Plaintiff's Motion for Partial Summary Judgment [ECF No. 52] is GRANTED. Within fifteen days of the date of this Order, the parties shall meet and confer and submit a joint notice with the court as to when they will be ready for trial. The court will then review its trial schedule and notify the parties of specific trail dates that are available.  The court will issue a Trial Order with pre-trial deadlines approximately ten weeks prior to trial.

DATED this 25th day of June 2026.

BY THE COURT:

_____
DALE A. KIMBALL,
United Sates District Judge